**2013-1462, -1463**

# United States Court of Appeals
# for the Federal Circuit

RYDEX, LTD.,

*Plaintiff-Appellant,*

*v.*

FORD MOTOR COMPANY and MAZDA MOTOR OF AMERICA, INC.
(doing business as Mazda North American Operations),

*Defendants-Cross Appellants,*

*and*

TOYOTA MOTOR SALES, U.S.A., INC.,

*Defendant-Cross Appellant,*

*and*

NISSAN NORTH AMERICA, INC.,

*Defendant-Cross Appellant,*

*and*

AMERICAN HONDA MOTOR CO., INC.and SUBARU OF AMERICA, INC.,

*Defendants.*

*Appeals from the United States District Court for the Southern District of Texas in case no. 11-CV-0122, Judge Vanessa D. Gilmore.*

## BRIEF OF PLAINTIFF-APPELLANT

Stamatios Stamoulis
STAMOULIS & WEINBLATT LLC
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
Telephone: (302) 999-1540
Fax: (302) 762-1688
Email: stamoulis@swdelaw.com
*Counsel for Appellant*

SEPTEMBER 30, 2013

# CERTIFICATE OF INTEREST

Counsel for the Defendant-Appellant certifies the following:

1. The full name of every party or amicus represented by me is:

Rydex, Ltd.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Stamatios Stamoulis
Richard C. Weinblatt
STAMOULIS & WEINBLATT LLC

Edward W. Goldstein
GOLDSTEIN LAW, PLLC

Alisa Anne Lipski
Califf Teal Cooper
Gregg Lee Goldstein
GOLDSTEIN & LIPSKI PLLC

Stephen F. Schlather
COLLINS, EDMONDS, POGORZELSKI, SCHLATHER
& TOWER, PLLC

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ......................................................... i

TABLE OF AUTHORITIES ............................................................ iv

STATEMENT OF RELATED CASES ............................................. vii

JURISDICTIONAL STATEMENT ................................................. 1

STATEMENT OF ISSUES ............................................................... 2

    I.  *Claim Construction*: .................................................................. 2

    II.  *Invalidity:* Whether the court erred by holding that claims 39 and 40 were impermissibly broadened during reexamination proceedings in violation of 35 U.S.C. § 305. ........................................................ 3

PRELIMINARY STATEMENT ....................................................... 4

STATEMENT OF THE CASE .......................................................... 6

STATEMENT OF THE FACTS ........................................................ 7

    A.  Patented Invention ................................................................. 7

    B.  The Asserted Claims ............................................................. 8

        Claim 22: ............................................................................... 9

        Claim 38: ............................................................................... 10

        Claim 39: ............................................................................... 10

        Claim 40: ............................................................................... 10

SUMMARY OF ARGUMENT ......................................................... 11

ARGUMENT ................................................................................... 12

    STANDARD OF REVIEW ......................................................... 12

    I.  CLAIM CONSTRUCTION ................................................. 12

A. The District Court's Construction of "Fluid Delivery Transaction" Is Too Narrow ........................................................................ 12

B. The Construction of The Term "Fluid Container" is Inconsistent With The Plain Meaning Of the Term ......................... 15

C. The Term "Fluid Delivery System" Requires No Construction ........ 15

D. The District Court Erred In The Construction of The Term "Information Regarding The Fluid Delivery Transaction Is Stored" ............................................................................ 17

E. The District Court Improperly Construed "Personal Identification Means For Generating An Identification Signal Identifying The Person" .......................................................... 18

F. The District Court Imports The Incorrect Function For "Information Communication Means Linking Said Fluid Delivery System Information Means And Said Personal Identification Means" ...................................................... 21

G. The Construction Of The Term "For The Transmission Of Operational Energy For Said Personal Identification Means" Is Wrong .................................................................................. 22

H. The Term "Memory Key" Requires No Construction ....................... 22

II. INVALIDITY .............................................................................. 23

A. Dependent Claims Presumed To Be More Narrow ......................... 24

B. New Claims Did Not Add New Material ........................................ 26

C. Claim Terms Must Be Construed First ........................................... 26

CONCLUSION ...................................................................................... 28

ADDEDNUM

CERTIFICATE OF SERVICE

CERTIFCIATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*AK Steel Corp. v. Sollac*,
  344 F. 3d 1234 (Fed. Cir. 2003) ................................................................. 24

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
  637 F.3d 1324 (Fed. Cir. 2011) ................................................................. 25

*Bionx Implants v. Biomet, Inc.*,
  1999 U.S. Dist. LEXIS 21651 (N.D. Ind. Dec. 29, 1999) ...................... 26, 27

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
  296 F.3d 1106 (Fed. Cir. 2002) .............................................................. 21, 22

*Creo Prods., Inc. v. Presstek, Inc.*,
  305  F.3d 1337 (Fed. Cir. 2002) ................................................................ 12

*Generation II Orthotics, Inc. v. Medical Tech., Inc.*
  263 F.3d 1356 (Fed. Cir. 2001) ................................................................. 18

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
  183 F.3d 1369 (Fed. Cir. 1999) ................................................................. 27

*In re Freeman*,
  30 F.3d 1459 (Fed. Cir. 1994) ................................................................... 27

*In re Lee*,
  277 F.3d 1338 (Fed. Cir. 2002) ................................................................... 4

*JVW Enters. v. Interact Accessories, Inc.*
  424 F.3d 1324 (Fed. Cir. 2005) ................................................................. 18

*Kearns v. Chrysler Corp.*,
  32 F.3d 1541 (Fed. Cir. 1994) ................................................................... 12

*Lockheed Martin Corp. v. Space Sys/Loral, Inc.*,
  249 F.3d 1314 (Fed. Cir. 2001) .............................................................. 21, 22

*Mahurkar v. C.R. Bard, Inc.*,
  79 F.3d 1572 (Fed. Cir. 1996) ................................................................... 12

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ................................................................. 15

*Oakley, Inc. v. Sunglass Hut Int'l*,
   316 F.3d 1331 (Fed. Cir. 2003) ................................................................. 27

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed.Cir. 2003) ................................................................. 14

*Pfizer, Inc. v. Ranabaxy Labs, Ltd.*,
   457 F.3d 1284 (Fed. Cir. 2006) ................................................................. 24

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ....................................................... 13, 16, 17

*Quantum Corp. v. Rodime, PLC*,
   65 F.3d 1577 (Fed. Cir. 1995) ................................................................. 27

*Rexnord Corp. v. Laitram Corp.*,
   274 F.3d 1336 (Fed. Cir. 2001) ................................................................. 23

*Rydex, Ltd. V. General Motors Company, et al.*,
   No. 4:11-CV-00122 (S.D. Tex. 2011) ........................................................ vii

*Sandisk Corp. v. Memorex Products, Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005) ........................................................... 5, 13

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (1997) ................................................................. 17

**Statutes**

28 U.S.C. § 1295(a)(1) ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

28 U.S.C. § 1338(a) ................................................................. 1

28 U.S.C. § 2107(a) ................................................................. 1

35 U.S.C. § 112 ................................................................. 25

35 U.S.C. § 282 ........................................................................... 4

35 U.S.C. § 305 ................................................................... *passim*

## Rules

Fed. R. Civ. P. 54(b) .................................................................... 6

## <u>STATEMENT OF RELATED CASES</u>

After the district court's claim construction order in *Rydex, Ltd. V. General Motors Company, et al.,* No. 4:11-CV-00122 (S.D. Tex. 2011) concerning U.S. Patent No. 5,204,819 ("the '819 patent), the district court entered a Joint Stipulation for Entry Order Granting Judgment of Non-Infringement on May 22, 2013. (A59-62.) Counsel for Rydex, LTD. ("Rydex") knows of no other cases pending that will be directly affected by the court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 & 1338(a) and entered a final judgment on May 21, 2013. (A59-62.) This appeal, noticed on July 2, 2013, is timely. 28 U.S.C. § 2107(a); Fed. R. App. P. 4. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

### <u>STATEMENT OF ISSUES</u>

I.  *Claim Construction*:

    a.  Whether the district court erred by construing the term "fluid delivery transaction" to mean "a commercial exchange involving delivery of fluid" in claims 22 and 38-40 of the '819 patent.

    b.  Whether the district court erred by construing the term "fluid container" to mean "a reservoir for storing fluid" in claims 22 and 38-40 of the '819 patent.

    c.  Whether the district court erred by construing the term "fluid delivery system" to mean "a system that transfers fluid from an external source to fluid containersbeing external to the vehicle in claims 22 and 38-40 of the '819 patent.

    d.  Whether the district court erred by construing the term "information regarding the fluid delivery transaction is stored" to mean "information relating to a commercial exchange involving delivery of fluid is stored" in claims 22 and 39-40 of the '819 patent.

    e.  Whether the district court erred in construing the term "memory key" to require "a memory module that is physically connected to a device to exchange data" in claim 39 of the '819 patent.

    f.  Whether the district court erred in construing the term "personal

identification means for generating an identification signal identifying the person" in claims 22 of the '819 patent.

g.  Whether the district court erred in construing the term "information communication means linking said fluid delivery system information means and said personal identification means" in claim 22 of the '819 patent.

h.  Whether the district court erred in construing the term "for the transmission of operational energy for said personal identification means" in claim 22 of the '819 patent.

II.  *Invalidity:* Whether the court erred by holding that claims 39 and 40 were impermissibly broadened during reexamination proceedings in violation of 35 U.S.C. § 305.

## PRELIMINARY STATEMENT

The district court made several errors when it construed several critical claim terms by impermissibly importing limitations into the claims which contradict the plain meaning, specification, and prosecution history of '819 patent. This improper ruling paved the way for the Defendants to incorrectly escape infringement.

Under Title 35 U.S.C. § 305, during the reexamination process, patent owners are permitted to add new claims in order to distinguish the invention as claimed from the prior art. As understood by Rydex, " [n]o proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding under this chapter." 35 U.S.C. § 305. For that reason, Rydex added only dependent claims during the reexamination process. The newly added claims are (1) more narrow rather than more broad in scope and (2) supported by the specification and therefore did not add new material or enlarge the scope of any claims.

The claims of the '819 patent are presumed valid. 35 U.S.C. §282. In addition, during the reexamination process, claims 22 and 38-40 were fully supported by the specification and issued without substantive amendment. The Patent Examiner responsible for the reexamination of the '819 patent (who is presumed to be one of ordinary skill in the art (*In re Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002)) agreed with Rydex that these claims did not broaden the scope of the '819 patent.

The Examiner agreed with Rydex that the term "container" comprises "fuel lines leading to an engine of the vehicle" and the term "fluid delivery device" comprises "a fuel pump of the vehicle." These definitions demonstrate that the district court's constructions are incorrect because they would exclude a specific, claimed embodiment of the invention of the '819 patent.

The court construed the terms "fluid delivery transaction," "fluid delivery system," and "container" to specifically exclude certain embodiments of the invention described in claims 22 and 38-40. It is well established that "a claim construction that excludes a preferred embodiment...is rarely, if ever, correct." *Sandisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005). Here, the district court failed to include a specific embodiment of Rydex's invention, it excluded a specifically claimed embodiment. Such a restrictive interpretation is incorrect.

The district court improperly construed certain terms of the '819 patent. Because there is more than enough record evidence to demonstrate that the district court improperly construed the claims of the '819 patent, the judgment in Defendants' favor must be vacated. Moreover, claims 39 and 40 were not impermissibly broadened during reexamination. Thus, judgment of invalidity should also be vacated.

## STATEMENT OF THE CASE

This action (CV 4:11-CV-00122) was commenced on January 12, 2011, when Rydex filed suit seeking infringement of claims 22 and 38-40 of U.S. Patent No. 5,204,819 ( the '819 patent) by the Ford Motor Company, Toyota Motor Sales, USA, Inc., Nissan North America, Inc., Mazda Motor of America, Inc., and Subaru of America, Inc. (collectively "Defendants")[1]. (A86.) Defendants filed an answer and counterclaims alleging that the '819 patent was invalid and not infringed. (A63-117.) The district court issued its construction of the disputed claim terms on December 7, 2012. The parties subsequently filed a Joint Stipulation of Noninfringement in which Rydex conceded that, under the district court's flawed constructions, Defendants' accused products did not satisfy certain claim limitations under the court's claim construction. (A53-58.) The district court thereupon dismissed Defendant's counterclaims, and entered judgment in favor of Defendants on May 22, 2013. (A59-62.) The district court certified its judgment on those claims and counterclaims as final under Fed. R. Civ. P. 54(b). An timely appeal followed.

---

[1] Plaintiff's Amended Complaint named the following additional defendants, all of whom have either settled or been dismissed: General Motors Company, Chrysler Group LLC, American Honda Motor Co., Inc., Mercedes-Benz USA, LLC, BMW of North American, LLC, Kia Motors America, Inc., Hyundai Motor America, Mitsubishi Motors North America, Inc., Saab Cars North American, Inc., and American Suzuki Motor Corp.

## STATEMENT OF THE FACTS

### A. Patented Invention

U.S. Patent No. 5,204,819 ("the '819 patent") issued on April 20, 1993 from an application filed on August 27, 1990. (A315.) The '819 patent originally contained twenty-two claims. Among these was independent claim 22, which has been asserted in this litigation. (A315.) On December 22, 2004, the inventor of the '819 Patent, Michael Ryan ("Ryan"), filed a Request for Ex Parte Reexamination asking the U.S. Patent & Trademark Office ("PTO") to determine whether the claims of the '819 patent were valid over certain prior art. (A315.) The PTO ordered reexamination of the '819 Patent based on these prior art references. During the reexamination process, independent claim 22 was confirmed as patentable without substantive amendment**:**

> ### *Allowable and Confirmed Subject Matter*
>
> Claims 2-8, 12-19, 21 and 23-40 are allowable over the prior art patents and printed publications within this reexamination proceeding.
>
> Claim 22 is confirmed over the prior art patents and printed publications within this reexamination proceeding. Note the Examiner's Amendment to correct a typographical error.

(A323.) In addition, certain new claims were also added during reexamination including dependent claims 35-40. The PTO found dependent claims 35-40 to be patentable. *Id.* Claims 38-40 are also being asserted in this case.

7

The '819 patent describes and claims an apparatus for controlling and memorializing a fluid delivery transaction requested by a person between a fluid container and a fluid delivery system that includes a personal identification system to generate an personal identification signal and a RF link between the fluid delivery system and a personal identification device. (A140: 20-60-67.) An information communication system links the fluid delivery system to the personal identification device. (A140: 21:1-11; 22:1-11.) A security mechanism may be associated with a storage and retrieval device for verifying an identification signal prior to the delivery of fluid to the fluid container. Information regarding the fluid delivery transaction may be stored at the fluid delivery system information system. (A140: 21:1-11; 22:1-11.) The personal identification may include a memory key or ignition key and the fluid delivery device may include a fuel pump of the vehicle. The fluid container may include fuel lines leading to an engine of the vehicle. (A1195:56-65.)

## B. The Asserted Claims

Rydex has asserted claims 22 and 38-40. Claims 38-40 depend from independent claim 22, which includes seven steps (a)-(g), with the construed claim terms in bold. (A1-52.)

**Claim 22:**

Apparatus for controlling and memorializing a **fluid delivery transaction** requested by a person between a **fluid container** and a **fluid delivery system**, comprising:

a.    **personal identification means for generating an identification** [signal.identifying] *signal identifying* **the person**;

b.    **means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means**;

c.    an RF link between said fluid delivery system information means and said personal identification means **for the transmission of operational energy for said personal identification means**;

d.    **information communication means linking said fluid delivery system information means and said personal identification means**;

e.    **security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container**; and

f.    **wherein information regarding the fluid delivery transaction is stored** at said fluid delivery system information means.

9

**Claim 38:**

Apparatus as defined in claim 22, wherein the personal identification comprises a **memory key**.

**Claim 39:**

Apparatus as defined in claim 38, wherein the memory key comprises an **ignition key** of a vehicle, the fluid delivery device comprises a fuel pump of the vehicle, and the fluid container comprises fuel lines leading to an engine of the vehicle.

**Claim 40:**

Apparatus as defined in claim 39, wherein the means associated with the fluid delivery system for storing and retrieving information and the security means comprise ignition switch control circuitry of the vehicle.

## SUMMARY OF ARGUMENT

The district court's claim constructions must be rejected. They are not supported by the intrinsic record, import improper limitations into the claims, and limit/exclude the terms to the embodiments in the specification.

The district court also incorrectly found claims 39 and 40 invalid because they were impermissibly broadened during reexamination proceedings and therefore invalid pursuant to 35 U.S.C. § 305. Under Title 35 U.S.C. § 305, during the reexamination process, patent owners are permitted to add new claims in order to distinguish the invention as claimed from prior art. Rydex agrees that "[n]o proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding under this chapter." 35 U.S.C. § 305. For that reason, Rydex added only dependent claims during the reexamination process. The newly added claims are (1) more narrow in scope and (2) fully supported by the specification. Therefore, claims 38-40 did not add new material or enlarge the scope of any claims. Moreover, claims 39-40 were allowed without substantive amendment.

## ARGUMENT

**STANDARD OF REVIEW**

Claim constructions are reviewed de novo. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996). A verdict of infringement is reviewed for substantial evidence if it rests on a correct claim construction. *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1547-48 (Fed. Cir. 1994). "Whether amendments made during reexamination enlarge the scope of a claim is a matter of claim construction, which this court reviews de novo." *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1344 (Fed. Cir. 2002).

**I. CLAIM CONSTRUCTION**

The district court improperly construed several terms of the '819 patent. The tainted constructions are based on a misreading of the specification and the incorrect importation of limitations in the claims. Read properly, the plain language of the claims is in strict alliance with and comports to the specification and prosecution history.

**A. The District Court's Construction of "Fluid Delivery Transaction" Is Too Narrow**

The district court construed the term "fluid delivery transaction" to mean "a commercial exchange involving delivery of fluid." (A23-25.) A lay juror is able to understand what this term means, and any further construction of this

word does not add any clarity. The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of the ordinary skill in the art in question at the time of invention. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005). In cases where the ordinary meaning of a term is readily apparent, no elaborate interpretation of the claims is necessary. *Phillips*, 415 F.3d at 1314.

Further, the spurious requirement that the "fluid delivery transaction" be commercial again limits the independent claim too narrowly to encompass the embodiment specifically claimed in dependent claims 39 and 40. Additionally, the district court's improperly narrow constructions would exclude embodiments, and in some cases, those specifically claimed. Therefore, the district court's constructions cannot be correct. "A claim construction that excludes a preferred embodiment is rarely, if ever, correct." *Sandisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (internal quotations omitted). The district court did not address this important canon of claim construction since it found the claims 39 and 40 invalid under § 305. As discussed in Section II below, the invalidity of claims 39 and 40 should be vacated and the court's construction should be reversed since "fluid delivery transaction" has a plain and ordinary meaning to a person of ordinary skill in the art, and therefore requires no construction.

The district court also improperly determined that "transaction" is ordinarily used to refer to an exchange that is commercial in nature. (A24.) The court "indulge[s] a heavy presumption that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed.Cir. 2003). As an initial matter, the word "commercial" does not appear in the '819 patent and is certainly not used to describe any portion of the invention. Here, the court's construction restricts this term to an improperly narrowed portion of its plain and ordinary meaning. Also, the construction fails to take into account the fact that claim 39 explicitly discloses an embodiment that is not "commercial" in nature, which is why the word "commercial" appears nowhere in the '819 patent. To limit the transaction to being commercial in nature would exclude a claimed embodiment. The court fails to take claims 39 and 40 into account as part of its claim construction analysis (which is, in itself, error), instead concluding that they are invalid In doing so, the court ignores that patentee has always argued that the specification supports these embodiments, the very opposite of the clear disavowal of claim scope that is required to narrow a claim. (A23-25.)

### B.    The Construction of The Term "Fluid Container" is Inconsistent With The Plain Meaning Of the Term

The court construed the term "fluid container" to mean "a reservoir for storing fluid." (A25-26.)   The term "fluid container" is easily understood and requires no construction. The district court improperly limits this term to a single example in the specification.   "Reservoir" does not provide more clarity than "container" to either one of skill in the art or a lay person.   District courts are not, and should not be, required to construe every limitation present in a patent's asserted claims. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). This term does not have more than one ordinary meaning, a fluid container contains fluid.   The term "container" is at least as easily understood to the lay person juror as the word "reservoir," perhaps more so.   Claim 39, however, specifically cites an embodiment where the "fluid container comprises fuel lines leading to the engine."   Thus, the term "fluid container" cannot and should not be limited to a reservoir if the term reservoir would necessarily exclude fuel lines.

### C.    The Term "Fluid Delivery System" Requires No Construction

The court construed the term "fluid delivery system" to mean "a system that transfers fluid from an external source to fluid containers." (A25-27.) Again,

the district court has read in unnecessary limitations into the claims. The plain and ordinary meaning of the term "fluid delivery system" is clear.

The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of the ordinary skill in the art in question at the time of invention. *Phillips*, 415 F.3d at 1313. In cases where the ordinary meaning of a term is readily apparent, no elaborate interpretation of the claims is necessary. *Phillips*, 415 F.3d at 1314.

The district court improperly imports a limitation from the specification into the term "fluid delivery system," requiring the transfer of fluid to be from an external source to fluid containers. Nothing in the intrinsic record shows that the term was ever to be limited in such a way. While the specification discloses an embodiment that includes transferring fluid from an external source, that is not the only embodiment. Therefore, the claims should not be limited by importing limitations from a single, specific embodiment. Again, claim 39 expressly states that the fluid container comprises fuel lines leading to an engine of the vehicle, indicating that the fluid delivery system in that embodiment is entirely internal and not coming from an external source as the court concluded. The district court's construction cannot be correct where it excludes not only a disclosed embodiment but a specifically claimed embodiment.

The drafting and allowance of these claims show there was never disavowed this embodiment. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (1997). It is not an opportunity to limit the claims to a single, preferred embodiment.

### D. The District Court Erred In The Construction of The Term "Information Regarding The Fluid Delivery Transaction Is Stored"

The court construed the term "information regarding the fluid delivery transaction is stored" to mean "information relating to a commercial exchange involving delivery of fluid is stored." (A44-46.) The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of the ordinary skill in the art in question at the time of invention. *Phillips*, 415 F.3d at 1313. In cases where the ordinary meaning of a term is readily apparent, no elaborate interpretation of the claims is necessary. *Phillips*, 415 F.3d at 1314.

As set forth above, the district court improperly relies on a single, specific embodiment to improperly import the word "commercial" into its claims constructions. While the claims may cover a commercial transaction, the invention of the '819 patent is not limited solely to this specific embodiment.

E.    **The District Court Improperly Construed "Personal Identification Means For Generating An Identification Signal Identifying The Person"**

The court misunderstood this term in its construction. (A29-A33.) The concept of a "personal identification means for generating an identification signal identifying the signal" is discussed several times in the specification, with several types of associated structure mentioned. The function of the personal identification is plainly set forth in the claim language itself – "generating an identification signal identifying the person."

When construing a functional statement in a means-plus-function limitation, a court must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim. *Generation II Orthotics, Inc. v. Medical Tech., Inc.* 263 F.3d 1356, 1364 – 1365 (Fed. Cir. 2001). The court concluded that this function somehow requires knowledge of the person's identity, such as a name or driver's license number. Again, the district court added language to the claim that would improperly limit it to read on only one possible embodiment. A court may not construe a means-plus-function limitation by adopting a function different from that explicitly recited in the claim. *JVW Enters. v. Interact Accessories, Inc.* 424 F.3d 1324, 1331 (Fed. Cir. 2005). The district court errs by importing the functions of a working device into the specific claims, rather than reading the claims for their meaning

independent of any working embodiment. *Id.* Further, the district court recognizes that the personal identification means must only "generat[e] an identification signal identifying a person *who is requesting fluid delivery transaction*." (A30.) (emphasis added). The specification, as cited by the district court, shows that the personal identification means need only identify that the person is an authorized user. It need not provide any information more specific than that, including the "identify of the person." Accordingly, the district court's construction is improperly narrow because it imports limitations from the specification (i.e., the personal identification means *may* provide the identity (e.g., name or driver's license number).

The structure identified by Rydex is all found to be associated with a personal identification means within the specification:

a) "The passive identification module thus functions like an identification card but which can be "petted" and read at a distance, permits the components of the active communication module 1000 to be completely sealed from the environment, is tamper proof, and can identify either a fuel container or an authorized person attempting to initiate a fuel delivery transaction." (A139; 17:28-24.)

b) "Yet a further feature is a system for identifying either a fluid container or an authorized person which utilizes a passive identification module

that has no independent power source but receives its operational energy from an RF signal generated by the fluid delivery device." (A131; 2:16-20.)

c)      "Identification information, such as the identity of a fluid container, fluid type for the container, and equipment type is stored in a programmable, read-only memory device 902." (A138; 16:15–19; *See also* 16:20–25.)

d)      "The passive identification module 900 includes a power receive coil 904 across which is connected a capacitor 906 selected to tune the coil to receive the 153.6 kHz power signal." (A138; 16: 36–39.)

e)      "The PSK encoder 902 and modulator 914 transmit the information stored on the PROM 902 through an LC circuit tuned to 76.8 kHz including a signal transmitting coil 916 and an appropriate capacitor 918." (A138; 16: 4 – 51.)

Rydex points to specific structure in the specification that is linked with the claimed function, as required by Federal Circuit precedent.

The court also relies on a section of the specification that states: "Alternatively, the passive identification module 200 may serve as an identification device for a person rather than a fluid container. In such an instance, the information stored on the PROM would be information identifying the person." (A138; Col. 16: l8-24.)  The court does not adequately explain why it chose to include "passive identification module" as structure while excluding

"a programmable read-only memory device". The passive identification module 900 shown in Figure 11 includes the programmable read-only memory device, a power receive coil, a signal transmitting coil, a phase shift key encoder and a modulator. Thus, Rydex's identification of the structure is the correct identification. Further, the added limitation that the structure "includes a memory that stores information that established the identity of the person" is simply incorrect. The kind of information that may be stored by the "personal identification means" is not corresponding structure.

### F. The District Court Imports The Incorrect Function For "Information Communication Means Linking Said Fluid Delivery System Information Means And Said Personal Identification Means"

The function of this term, as set forth by the plain language of the claim itself, is "linking said fluid delivery system information means and said personal identification means." The court erred in its construction. (A36-39.)

Again, the court misidentifies the claimed function by rewriting and limiting the explicit function stated in the claim. As explained above, this is improper. The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language and only those limitations. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 296 F.3d 1106, 1113* (Fed. Cir. 2002) citing *Lockheed Martin*, 249 F.3d at 1324. It is improper to narrow the scope of the function beyond the claim language. *Id.*

Therefore, the function should be construed exactly as it is stated within the claim: "linking said fluid delivery system information means and said personal identification means." The court's added "communication" requirement must be rejected outright to avoid error.

### G. The Construction Of The Term "For The Transmission Of Operational Energy For Said Personal Identification Means" Is Wrong

The court imports limitations into a very clear functional requirement. (A43.) The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language and only those limitations. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 296 F.3d 1106, 1113* (Fed. Cir. 2002) citing *Lockheed Martin*, 249 F.3d at 1324. It is improper to narrow the scope of the function beyond the claim language. *Id.* Therefore, the function should be construed exactly as it is stated within the claim: "for the transmission of power to the personal identification means." The court's added requirements must be rejected outright to avoid error.

### H. The Term "Memory Key" Requires No Construction

The court improperly limited a "memory key" to "a memory module that is physically connected," citing to one place in the specification that gives one example of what could constitute a memory key. (A46-48.) As with the district court's other arguments, this too fails because it is but one possible embodiment of the claimed

invention. Rather than improperly limiting the term, the court should give a claim term 'the full range of its ordinary meaning as understood by an artisan of ordinary skill." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)). The term memory key requires no construction and certainly should not be limited to having a physical connection, because the district court's construction does not permit the full range of the terms' ordinary meaning to one of ordinary skill in the art.

Underscoring that the district court limited its construction to a specific embodiment, it reasoned that "when written in 1990, contemplated that any memory key associated with the modules would be physically connected to a device in order to exchange data." (A47.) It is well settled law that claims should not be limited solely to specific embodiments disclosed in the specification. The district court gave no proper reason that the patentee should not receive the full scope of this term.

## II. INVALIDITY

The district court incorrectly found claims 39 and 40 invalid because they were impermissibly broadened during reexamination proceedings in violation of 35 U.S.C. § 305. (A18-21.)

Under Title 35 U.S.C. § 305, during the reexamination process, patent owners are permitted to add new claims in order to distinguish the invention as claimed from prior art. Rydex agrees that " [n]o proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination

proceeding under this chapter." 35 U.S.C. § 305. For that reason, Rydex added only dependent claims during the reexamination process. The newly added claims are (1) more narrow rather than more broad in scope and (2) supported by the specification and therefore did not add new material or enlarge the scope of any claims.

## A. Dependent Claims Presumed To Be More Narrow

In an effort to distinguish an argument about claim differentiation, the district court relies on *Pfizer, Inc.v. Ranbaxy Labs, Ltd*., in which the court held that a dependent claim was invalid because it included subject matter not within the scope of the claim from which it depends. *Pfizer*, 457 F.3d 1284, 1291–92 (Fed. Cir. 2006). (A18-21.)  In *Pfizer*, the patentee failed to include an explicit limitation of the independent claim in the dependent claim, in what both the lower court and the appeal court considered a drafting error. *Id.* The *Pfizer* case, however, is the rare exception to the well-established rule that "under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend." *AK Steel Corp. v. Sollac*, 344 F. 3d 1234, 1242 (Fed. Cir. 2003).  Claims 39 and 40 are both dependent upon independent claim 22, which was confirmed during the reexamination process without substantive alteration.  Further, Rydex's patent attorney who prosecuted

the reexamination, Mr. Kent Herink, testified that he believes claim 39 is narrower than claim 22.

> Q – So, you were concerned that the original claims hadn't broad enough – broad enough to cover a subject matter that you believe Mr. Ryan felt was within the scope of the invention?

> A – I guess I have to disagree with that because 39 is dependent on 22. And I think sort of black-letter patent law says that 39 must be narrower than 22. And since 22 was confirmed – You know, we already had broader protection in 22 than arguably we have in 39. So, I guess I have to disagree with your question.[2]

Claims 39 and 40 must therefore be presumed to be more narrow than claim 22 and do not enlarge the scope of any claim. Again, the case law supports Plaintiff's position. "'Indeed, whereas here, the claims describe the same relationship using different terms, the assumption is that the term in the dependent claim has a narrower scope. *See* 35 U.S.C. § 112, ¶ 4. (Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed.')" *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1335 (Fed. Cir. 2011).

---

[2] (A232; 167:18-168:10)

## B. New Claims Did Not Add New Material

In a reexamination process, the PTO considers whether new claims are broader than the original claims, as well as whether or not there is support for the new claims in the specification. *See Bionx Implants v. Biomet, Inc*., 1999 U.S. Dist. LEXIS 21651 (N.D. Ind. Dec. 29, 1999). Therefore, this issue has already been initially decided by the PTO.  During the reexamination process, Rydex cited to support in the specification for the new claims. Specifically, Rydex pointed to column 3, lines 41–50; Fig. 2; column 2, lines 15–20; column 5, lines 25–35; column 6, lines 19–25; column 17 lines 1–39 and elsewhere.[3]

At no time during the process did the PTO voice any objections to the new claims improperly broadening any claims or improperly adding new material. Furthermore, in his deposition, Rydex's prosecution counsel, Mr. Herink was taken through each claim element of the amended claims.  He pointed to places in the specification that supported each element, further negating the assertion that claims 39 and 40 add new, unsupported matter to the patent.[4]

## C. Claim Terms Must Be Construed First

The first step to a determination of the scope of a claim is claim construction. "Whether the scope of a claim has been impermissibly broadened on

---

[3] (A379-392.)

[4] (A232; 123:7–160:2.)

26

reexamination is a matter of claim construction,'' *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1580 (Fed. Cir. 1995); *see Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369 (Fed. Cir. 1999). "A claim of a reissue application[5] is broader in scope than the original claims if it contains within its scope any conceivable apparatus or process which would not have infringed the original patent." *In re Freeman*, 30 F.3d 1459, 1464 (Fed. Cir. 1994). Disregarding claims 39 and 40 for the moment, a system that infringes those claims would still infringe claim 22, which was reaffirmed during the reexamination process. Any apparatus that infringes claims 39 or 40 would also infringe claim 22, as demonstrated by Rydex's infringement contentions. "To overcome the presumption that patents are valid, clear and convincing evidence is required.'' *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). Not only did the record not include clear and convincing evidence, the court have failed to consider any evidence of an apparatus or process which would not have infringed the original patent, but would infringe the reexamined patent. *See Bionx Implants v. Biomet, Inc.*, 1999 U.S. Dist. LEXIS 21651 (N.D. Ind. Dec. 29, 1999) ("Biomet has provided no evidence of any conceivable apparatus or process which would not have infringed the original patent but would infringe the reexamined patent.").

---

[5] Reexamination applications are treated the same as reissue applications for purposes of determining whether or not a claim has been improperly broadened. *In re Freeman*, 30 F.3d 1459, 1464 (Fed. Cir. 1994)

## <u>CONCLUSION</u>

For all the reasons set forth above, the district court improperly construed the disputed claim terms and Rydex's constructions should be adopted. Additionally, the invalidity of claims 39 and 40 should be vacated.

Respectfully submitted,

/s/ Stamatios Stamoulis
Stamatios Stamoulis
STAMOULIS & WEINBLATT LLC
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
Telephone:  (302) 999-1540
Fax:            (302) 762-1688
Email: stamoulis@swdelaw.com
Counsel for Appellant

CASE PARTICIPANTS ONLY

Case: 13-1462    Document: 46    Filed: 09/30/2013    Page: 37

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

*Page*

December 7, 2012 Order of the Court .................................................................. A1

May 21, 2013 Final Judgment ......................................................................... A59

U.S. Patent No. 5,204,819 ............................................................................... A118

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **RYDEX, LTD.** | § | |
| | § | |
| | § | |
| **versus** | § | **CIVIL ACTION NO. H-11-122** |
| | § | |
| | § | |
| **FORD MOTOR COMPANY** | § | |

## ORDER

In this patent infringement suit, the Court is asked to construe the asserted claims of U.S. Patent No. 5,204,819 (the "'819 Patent"). A hearing was held on July 19, 2012, during which the parties presented argument in support of their proposed constructions. This Court now construes the disputed claim terms as a matter of law under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).

## I.

### A.

On April 20, 2003, United States Letters Patent No. 5,204,819 (the "'819 patent") was duly and legally issued to Michael C. Ryan for an invention titled Fluid Delivery Control Apparatus. The '819 Patent was the subject of a reexamination proceeding that culminated on November 21, 2006 with the issuance of an ex parte reexamination certificate. On or about August 21, 2009, Mr. Ryan assigned all rights, title and interest in and to the '819 Patent to Rydex Ltd. Rydex Ltd. remains the sole assignee of the '819 patent. *See* (Instrument No. 154, at 5).

The '819 Patent relates generally to an apparatus for controlling the delivery of a fluid to a container or reservoir and, more specifically, to an apparatus for the exchange of security, identification, and transaction information between a container, such as a vehicle fuel tank or other fluid storage tank,

1

A1

and a fluid delivery system, such as a fuel pump and fuel lines at gas station. (Instrument No. 301-1, at 15 ¶ 1:5-10).

The background section of the '819 patent explains that many vehicles are operated as part of a commercial enterprise and, as a result, often times the vehicle is owned by someone other than the person who is actually operating and refueling the vehicle. According to the inventor, this dissonance between the owner of the vehicle and the operator of the vehicle presents an opportunity for employees of a company to use company credit cards to pay for the refueling of their own personal vehicles instead of the company's vehicles. *See* (Instrument No. 301-1, at ¶ 1: 15-26).

To prevent this unauthorized dispensing of fuel and also to ensure that the fuel delivered to company vehicles is properly recorded and charged, the '819 patent discloses two specific systems of identification modules.

The first is a personal identification module for storing information that establishes the identity of a specific person. *See* (Instrument No. 301-1, at 22 ¶ 16: 18-24). This system utilizes an identification module to identify the particular person requesting the fuel to a controller in a fuel pump at a refueling station. This personal identification module is, thus, supposed to ensure that only the correct persons can receive fuel from the refueling station. *See* (Instrument No. 301-1, at 2). According to the specification of the '819 patent, the identification module generates an identification signal based on the personal information. That signal is then transmitted to a controller associated with the fuel delivery system, where the identity of the person and/or the identity of the vehicle is verified before the fuel can be delivered. (Instrument No. 301-1, at 24¶ 20:61- 25¶ 22:10).

A2



The second is a vehicle identification module for storing information that identifies a specific vehicle. This vehicle identification module is supposed to ensure that only the correct vehicles can receive fuel from the refueling station. The system disclosed in the '819 patent also uses wireless radio frequency technology to provide power to the identification module, so that it does not need its own battery or other power source.

Although the '819 patent discloses two types of identification modules, the claims asserted in this case expressly require a "personal identification means for generating an identification signal identifying the person" requesting the fluid delivery, as opposed to a vehicle identification module.

## B.

Plaintiff Rydex, Ltd. ("Plaintiff" or "Rydex") has sued Defendants General Motors Company, Ford Motor Company, Chrysler Group LLC, Toyota Motor Sales, USA, Inc., American Honda Motor Co., Inc., Nissan North America, Inc., Mercedes-Benz USA, LLC, BMW of North American, LLC, Kia Motors America, Inc., Hyundai Motor America, Mazda Motor of America, Inc., Mitsubishi Motors North America, Inc., Saab Cars North American, Inc., Subaru of America, Inc., and American Suzuki Motor Corp. ("Defendants") for infringement of the '819 patent. In short, Plaintiff alleges that the Defendants infringed the patent by making, using, selling and/or offering for sale in the United States apparatuses which comprise a radio-frequency identification ("RFID") tag or chip in a vehicle key,

wherein the key in combination with the ignition system of a vehicle causes the fuel pump of the vehicle to provide fuel to the vehicle. *See* (Instrument No. 154, at 5-10).

On June 5, 2012, in anticipation of the *Markman* hearing, the Plaintiff submitted its initial position paper, Plaintiff's Opening Claim Construction Brief (Instrument No. 301) stating its positions on each of the terms in dispute in this case. On June 20, 2012, Defendants filed their Claim Construction Response Brief, (Instrument No. 309), wherein the Defendants proffered their own definitions of all the terms in dispute. On July 2, 2012, Plaintiff filed a Reply to Defendants' Claim Construction Response Brief (Instrument No. 315). Subsequently, on July 6, 2012, Defendants' filed a Sur-reply Claim Construction Brief. *See* (Instrument No. 318).

## C.

The parties' dispute centers on the meaning of terms contained in three claims: claim 22, claim 38, and claim 39. The parties contest the meaning of nine terms contained in claim 22, one term contained in claim 38, and one term in claim 39.

## 1.

Claim 22 of the '819 Patent describes the patent as relating to an:

Apparatus for controlling and memorializing a <u>fluid delivery transaction</u> requested by a person between a <u>fluid container</u> and a <u>fluid delivery system</u>, comprising:
    a. <u>personal identification means for generating an identification [signal.identifying] signal identifying the person</u>[1];
    b. <u>means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means;</u>
    c. an RF link between said fluid delivery system information means and said personal identification means <u>for the transmission of operational energy for said personal identification means;</u>
    d. <u>information communication means linking said fluid delivery system information means and said personal identification means;</u>

---

[1] In the patent specification this term is denoted as "personal identification means for generating an identification signal.identifying the person". This appears to be a grammatical error and the parties have read the term to mean "personal identification means for generating an identification signal identifying the person" *See* (Instrument No. 309, at 17; Instrument No. 301, at 15).

    e. <u>security means associated with said storage and retrieval device for verifying</u>
<u>said identification signal prior to the delivery of fluid to the fluid container</u>; and
    f. wherein <u>information regarding the fluid delivery transaction is stored</u> at said
fluid delivery system information means.

(Instrument No. 301-1, at 24-25 ¶ 20:61- 22:10) (emphasis added). The parties dispute the meaning of

nine terms in claim 22: (1) "fluid delivery transaction"; (2) "fluid container"; (3) "fluid delivery

system"; (4) "personal identification means for generating an identification signal identifying the

person"; (5) "means associated with the fluid delivery system for storing and retrieving information and

capable of being operatively linked to said personal identification means"; (6) "information

communication means linking said fluid delivery system information means and said personal

identification means"; (7) "security means associated with said storage and retrieval device for verifying

said identification signal prior to the delivery of fluid to the fluid container"; (8) "for the transmission of

operational energy for said personal identification means" and (9) "information regarding the fluid

delivery transaction is stored".

**2.**

    Claim 38 of the '819 patent describes the patent as relating to an "apparatus as defined in claim

22, wherein the personal identification comprises a <u>memory key</u>." (Instrument No. 301-1, at 28 ¶ 4:55-

56) (emphasis added). The parties dispute the meaning of one term in claim 38: "memory key".

**3.**

    Claim 39 of the '819 patent describes the patent as relating to an "apparatus as defined in claim

38, wherein the memory key comprises an <u>ignition key</u> of a vehicle, the fluid delivery device comprises

a fuel pump of the vehicle, and the fluid container comprises fuel lines leading to an engine of the

vehicle." (Instrument No. 301-1, at 28 ¶ 4:57-61) (emphasis added). The parties dispute the meaning of

one term in claim 39: "ignition key".

The table below summarizes the claim constructions proposed by the parties.

| Term No. | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 | "fluid delivery transaction" | This term requires no construction. | a commercial exchange involving delivery of fluid |
| 2 | "fluid container" | This term requires no construction. | a reservoir for storing fluid |
| 3 | "fluid delivery system" | This term requires no construction. | a system that transfers fluid from an external source to fluid containers |
| 4 | "personal identification means for generating an identification signal identifying the person" | **Function** – generating an identification signal identifying the person<br><br>**Structure** – a programmable read only memory device, a power receive coil, a signal transmitting coil, a phase shift key encoder and a modulator plus equivalents | **Function** – for generating a signal containing information that itself establishes the identity of the person requesting the fluid delivery transaction<br><br>**Structure** – a passive identification module that includes a memory that stores information that establishes the identity of the person |
| 5 | "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means" | **Function** – storing and retrieving information<br><br>**Structure** – a central processing unit, memory and a data bus plus equivalents | **Function** – for storing and retrieving information and capable of being operatively linked to the personal identification means<br><br>**Structure** – a fuel pump module of a service station, pump truck, or stationary tank that includes a central processing unit and a non-volatile memory |

A6

| Term No. | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 6 | "information communication means linking said fluid delivery system information means and said personal identification means" | **Function** – linking said fluid delivery system information means and said personal identification means<br><br>**Structure** – a coil capable of transmitting a signal and a coil capable of receiving a signal | **Function** – for the communication of information between the fluid delivery system information means and the personal identification means<br><br>**Structure** – a signal transmitting coil and a signal receiving coil |
| 7 | "security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container" | **Function** – verifying said identification signal prior to the delivery of fluid to the fluid container<br><br>**Structure** – a signal receiving coil, a demodulator and a phase shift key decoder plus equivalents | **Function** – verifying said identification signal prior to the delivery of fluid to the fluid container<br><br>**Structure** – The specification does not disclose sufficient structure for performing the recited function and therefore claim 22 is invalid under 35 U.S.C. § 112. |
| 8 | "for the transmission of operational energy for said personal identification means" | for the transmission of power to the personal identification means | for the transmission of power to the personal identification means which has no independent battery or other power source |
| 9 | "information regarding the fluid delivery transaction is stored" | This term requires no construction. | information relating to a commercial exchange involving delivery of fluid, such as price of fluid, type of fluid, date and quantity of delivery, that is memorialized for record keeping purposes |
| 10 | "memory key" | This term requires no construction. | a memory module that is physically connected to a device to exchange data. |
| 11 | "ignition key" | This term requires no construction. | a mechanical key used in a motor vehicle to turn the ignition switch of the vehicle |

A7

**D.**

In addition to their dispute over the definition of claims 22, 38, and 39, the parties also dispute whether the Rydex improperly broadened the scope of claims 39 and 40 during reexamination. In December 2004, over a decade after the '819 patent originally issued, Rydex submitted a request to the Patent Office to have the patent reexamined. *See* (Instrument No. 309-1, at 78-88). Rydex stated that it wanted the Patent Office to confirm its patent over additional prior art that had not previously been considered. *Id.* at 82-87. The Patent Office confirmed claim 22 without substantive alteration. *See* (Instrument No. 309-1, at 99) ("Claims 10, 21 and 22 are confirmed."). Rydex also added new dependent claims onto claim 22. *See* (Instrument No. 309-1, at 169 – 175). Among these, claims 39 and 40 were added. *See* (Instrument No. 309-1, at 175).

Claim 39 relates to an apparatus as defined in claim 38, wherein the memory key comprises an ignition key of a vehicle, the fluid delivery device comprises a fuel pump of the vehicle, and the fluid container comprises fuel lines leading to an engine of the vehicle. (Instrument No. 301-1, at 28 ¶ 4:57-61). Claim 40 relates to an apparatus as defined in claim 39, wherein the means associated with the fluid delivery system for storing and retrieving information and the security means comprise ignition switch control circuitry of the vehicle. (Instrument No. 301-1, at 28 ¶ 4:62-65).

A8

| CHALLENGES TO CLAIMS 39 & 40 | | | |
|---|---|---|---|
| No. | Issue | Plaintiff's Contentions | Defendants' Contentions |
| 1 | Whether Rydex's addition of claim 39 during reexamination was an improper broadening amendment in violation of 35 U.S.C. § 305?[2] | This issue is not properly raised under the Court's rules as part of the parties claim construction process. As such, Rydex should not be required to and does not intend to respond to Defendants' improper allegations in its opening claim construction brief. | Rydex's addition of claim 39 during reexamination was an improper broadening amendment in violation of 35 U.S.C. § 305. |
|  | Whether claim 39 is invalid as lacking proper support pursuant to 35 U.S.C. §112 | To the extent this issues requires a response at this time, Rydex denies that claim 39 was improperly broadened or that it is lacking proper support pursuant to 35 U.S.C. §112. | The '819 patent lacks disclosure required to support claim 39. |
| 2 | Whether Rydex's addition of claim 40 during reexamination was an improper broadening amendment in violation of 35 U.S.C. § 305? | This issue is not properly raised under the Court's rules as part of the parties claim construction process. As such, Rydex should not be required to and does not intend to respond to Defendants' improper allegations in its opening claim construction brief. | Rydex's addition of claim 40 during reexamination was an improper broadening amendment in violation of 35 U.S.C. § 305. |
|  | Whether claim 40 is invalid as lacking proper support pursuant to 35 U.S.C. §112. | To the extent this issues requires a response at this time, Rydex denies that claim 40 was improperly broadened or that it is lacking proper support pursuant to 35 U.S.C. §112. | The '819 patent lacks disclosure required to support claim 40. |

## II.

### A.

Whoever without authority makes, uses, or sells any patented invention within the United States during the term of the patent therefor, infringes the patent. 35 U.S.C. § 271. The determination of whether a claim of a patent has been infringed is a two-step process. First, the Court must determine the meaning and scope of the patent claims asserted to be infringed. *See Bell Atl. Network Servs., Inc. v.*

---

[2] *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1344 (Fed. Cir. 2002) ("Whether amendments made during reexamination enlarge the scope of a claim is a matter of claim construction . . . .").

*Covad Comms. Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd,* 116 S. Ct. 1384 (1996). This step is commonly known as claim construction or interpretation. Claim construction, including the construction of terms of art within a claim, is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Second, the court must compare the claims alleged to be infringed to the accused device. *See Bell Atlantic*, 262 F.3d at 1267; *Markman*, 52 F.3d at 976. This second-step is a factual determination reserved for the trier-of-fact. *Cook Biotech, Inc. v. Acell, Inc.*, 460 F.3d 1365, 1373 (Fed Cir. 2006); *Middleton, Inc. v. Minn. Mining & Mfg. Co.*, 311 F.3d 1384, 1387 (Fed. Cir. 2002).

The standards governing claim construction are well established. "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The goal of a *Markman* hearing is to arrive at the ordinary and customary meaning of a claim term in the eyes of a person of ordinary skill in the art. *Phillips*, 415 F.3d at 1313. Proper claim construction demands interpretation of the entire claim in context, not a single element in isolation. *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) ("claim terms [are not construed] in a vacuum, devoid of the context of the claim as a whole."); *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999). Accordingly, "the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips*, 415 F.3d at 1316.

## 1.

When construing a claim, "the words of a claim are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576,

A10

1582 (Fed. Cir. 1996); *Kyocera*, 545 F.3d at 1346. The ordinary and customary meaning of claim "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. "[W]ords in patent claims are given their ordinary meaning in the usage of the field of the invention, unless the text of the patent makes clear that a word was used with a special meaning". *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999). Thus, "unless compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning as understood by an artisan of ordinary skill." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

In some cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips,* 415 F.3d at 1314. Where, however, the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone, the court must look to "sources available to the public that show what a person of skill in the art would have understood [the] disputed claim language to mean." *Phillips,* 415 F.3d at 1314.

When construing such claims, the Court first looks to intrinsic evidence of claim meaning "*i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics*, 90 F.3d at 1582. The "intrinsic record in a patent case is the primary tool to supply the context for interpretation of disputed claim terms," because the intrinsic record "provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of invention." *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005); *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir. 2005). Accordingly, the interpretation of a claim term "should be harmonized, to the extent possible,

A11

with the intrinsic record, as understood within the technological field of the invention," *Lexicon Medical, LLC v. Northgate Tech., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011).

In reviewing the intrinsic record, the court must first "look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics*, 90 F.3d at 1582; *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1358 (Fed. Cir. 2012). Given that the "claims define the patent right naturally the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed Cir. 2009). As such, the "context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. Similarly, the relationship between the asserted claim and other claims can provide additional instruction because "terms are normally used consistently throughout the patent." *Phillips*, 415 F.3d at 1314. Thus, "usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. Finally, the "[d]ifferences among claims can also be a useful guide" when discerning the meaning of a particular claim term. *Phillips*, 415 F.3d at 1314. Thus, claim language and the context in which that language arises can be illustrative and often "provide[s] a firm basis for construing [a challenged] term." *Phillips*, 415 F.3d at 1314.

## 2.

The claims and the claim language, of course, do not stand alone. Rather, "they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Phillips*, 415 F.3d at 1315. "In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention." *Metabolite Labs, Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004). Therefore, the "claims must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315; *Abbott Labs*, 566 F.3d at 1288 (the specification "is always highly relevant to the claim construction analysis").

12

For example, the review of the specification may reveal that the patentee has defined his own terms or given a claim term a different meaning than it would otherwise possess. *Phillips*, 415 F.3d at 1316. In such cases, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). On other occasions, "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Phillips*, 415 F.3d at 1316. In that instance as well, the inventor has delineated the correct claim scope, and the inventor's intention, as expressed in the specification, is dispositive. *Phillips*, 415 F.3d at 1316. Given the nuance supplied by the specification, the "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Società per Azioni*, 158 F.3d, 1243, 1250 (Fed. Cir. 1998) (citations omitted)).

### 3.

The prosecution history is the final interpretative tool in the intrinsic record. *See Phillips*, 415 F.3d at 1317. The prosecution history includes "all express representations made by or on behalf of the applicant to the examiner to induce a patent grant, or . . . to reissue a patent . . . includ[ing] amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985); *see also Phillips*, 415 F.3d at 1317. The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582–83).[3] Although, the prosecution history may be informative on how the inventor and United States

---

[3] Under the doctrine of prosecution disclaimer, for example, the patentee may be precluded from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citing cases). The doctrine is only invoked where the patentee clearly and unambiguously disclaimed or

Patent and Trademark Office ("PTO") understood the patent, it is often less useful than the specification because the prosecution history is the fruit of negotiations between the inventor and PTO and, as such, lacks the clarity of the final specification. *Phillips*, 415 F.3d at 1317.

When consulting the intrinsic record to clarify the meaning of claim terms, courts must take care not to import limitations into the claims from the specification. *Abbott Labs*, 566 F.3d at 1288. Thus, for example, "when the specification describes a single embodiment to enable the invention, th[e] court will not limit broader claim language to that single application" unless the patentee has demonstrated that the claims themselves, the specification, or the prosecution history "clearly indicate that the invention encompasses no more than that confined structure or method." *Abbott Labs*, 566 F.3d at 1288. A patent is not restricted to the preferred embodiments or examples provided in the intrinsic record, but rather the patent is defined by the words of the claims. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 -10 (Fed. Cir. 2004)*; Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988).

### 4.

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics*, 90 F.3d at 1582. If the intrinsic evidence is clear, "it is improper to rely on extrinsic evidence in construing the patent claims." *Vitronics*, 90 F.3d at 1582. Where ambiguity persists the court may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980). Extrinsic evidence, however, is "in general . . . less reliable than the patent and its prosecution history" because it is not part of the patent and may not have been created at the time of the patent's prosecution; extrinsic publications may not

---

disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Phillips*, 415 F.3d at 1325 (only when "the patentee has unequivocally disavowed a certain meaning to obtain his patent [does] the doctrine of prosecution disclaimer attach[] and narrow the ordinary meaning of the claim congruent with the scope of the surrender"). The doctrine of prosecution disclaimer has become a basic principle of claim interpretation because it "promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

have been written by or for skilled artisans; and expert reports and testimony created at the time of litigation may suffer from bias not present in intrinsic evidence. *Phillips*, 415 F.3d at 1318.

Extrinsic evidence is therefore "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317. Accordingly, "the general meanings gleaned from reference sources, such as dictionaries [and treatises], must always be compared against the use of the terms in context, and the intrinsic record must always be consulted to identify which of the different possible dictionary meanings is most consistent with the use of the words by the inventor." *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,* 334 F.3d 1294, 1300 (Fed. Cir. 2003); *see also Wavetronix v. EIS Elec. Integrated Sys.,*573 F.3d 1343, 1355 (Fed. Cir. 2009). Otherwise, dictionary definitions will effectively be "converted into technical terms of art having legal, not linguistic, significance," *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998), relegating the intrinsic evidence to a mere "check on the dictionary meaning of a claim term." *Phillips*, 415 F.3d at 1320. In light of these considerations, extrinsic evidence is primarily used to facilitate "the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Markman*, 52 F.3d at 981.

## B.

Special rules of claim construction apply when a patent claim falls within the scope of 35 U.S.C. § 112, ¶ 6. Section 112 provides that:

> [a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112. Section 112, thus, allows a patentee to "describe an element of his invention by the result accomplished or the function served, rather than describing the item or element to be used." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 27 (1997). Claims expressed in this

manner are typically called "means-plus-function" claims. *See e.g. TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008); *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009). Means-plus-function claims contain only purely functional limitations but do not provide the structures that perform the recited function. *See Phillips*, 415 F.3d at 1311; *TriMed*, 514 F.3d at 1259.

The "task of determining whether the relevant claim language contains a means-plus-function limitation is, as with all claim construction issues, a question of law" for the court. *TriMed*, 514 F.3d at 1259. "Use of the word 'means' in claim language creates a presumption" that 35 U.S.C. § 112, ¶ 6 applies. *TriMed*, 514 F.3d at 1259; *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005). This presumption is rebutted by showing that the claim element recites both a function and sufficient structure for performing that function. *TriMed*, 514 F.3d at 1259. "Sufficient structure exists when the claim language specifies the exact structure that performs the functions in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure." *TriMed*, 514 F.3d at 1259-60.

If the Court concludes that the relevant claim language contains a means-plus-function limitation, the court must first identify the function of the limitation. *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1377 (Fed. Cir. 2008). When completing this step, the court must take caution not to "import functional limitations that are not recited in the claim." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001); *Welker Bering*, 550 F.3d at 1097. Second, the court must "identify the corresponding structure in the written description necessary to perform that function." *Minks*, 546 F.3d at 1377. The "[s]tructure disclosed in the specification is [a] corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Minks*, 546 F.3d at 1377.

Whether the written description adequately sets forth structure corresponding to the claimed function is considered from the perspective of a person skilled in the art. *Intel Corp.*, 319 F.3d at 1365-

66 (citing *Budde*, 250 F.3d at 1376). The question is not whether one of skill in the art would be capable of implementing a structure to perform the function, but whether that person would understand the written description itself to disclose such a structure. *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008). In conducting the second step, the court must not import "structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger*, 239 F.3d at 1233; *Welker Bering*, 550 F.3d at 1097. "Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001)

If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the patentee will have failed to particularly point out and distinctly claim the invention, as required by section 112, thereby rendering the claim invalid for indefiniteness. *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed Cir. 2009). "To the extent there are any factual findings upon which a trial court's indefiniteness conclusion depends, they must be proven by the challenger by clear and convincing evidence." *Tech. Licensing*, 545 F.3d at 1338.

### C.

Under 35 U.S.C. § 305, "[n]o proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding." 35 U.S.C. § 305. Whether amendments made during reexamination enlarge the scope of a claim is a matter of claim construction." *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1344 (Fed. Cir. 2002).

In determining whether a patentee broadened a reexamined claim under 35 U.S.C. § 305, the court "must analyze the scope of the claim prior to reexamination and compare it with the scope of the claim subsequent to reexamination." *Creo Prods.*, 305 F.3d at 1344. A reexamined claim is broader in scope than the original claim if the reexamined claim "contains within its scope any conceivable apparatus or process which would not have infringed the original patent." *Hockerson-Halberstadt, Inc.*

A17

*v. Converse Inc.,* 183 F.3d 1369, 1374 (Fed. Cir. 1999); *see also Creo Prods.,* 305 F.3d at 1344. A reexamined claim that is broader in any respect is considered to be broader than the original claim even though it may be narrower in other respects. *Creo Prods.,* 305 F.3d at 1344. "Claims that are impermissibly broadened during reexamination are invalid." *Predicate Logic, Inc. v. Distributive Software, Inc.,* 544 F.3d 1298, 1302 (Fed. Cir. 2008).

## III.

The determination that amendments made during reexamination enlarge the scope of a claim is a matter of claim construction. *Creo Prods.,* 305 F.3d at 1344. The Court begins its claim construction by first addressing the parties' arguments pertaining to the claim validity of amended claims 39 and 40. In determining whether a patentee broadened a reexamined claim under 35 U.S.C. § 305, the court "must analyze the scope of the claim prior to reexamination and compare it with the scope of the claim subsequent to reexamination." *Creo Prods.,* 305 F.3d at 1344. A reexamined claim is broader in scope than the original claim if the reexamined claim contains within its scope any conceivable apparatus or process which would not have infringed the original patent. *Creo Prods.,* 305 F.3d at 1344

In December 2004, over a decade after the '819 patent originally issued, Rydex submitted a request to the Patent Office to have the patent reexamined. *See* (Instrument No. 309-1, at 78-88). In the reexamination, Rydex also added new dependent claims 39 and 40 onto claim 22. *See* (Instrument No. 309-1, at 169 – 175).

Claim 39 relates to an "apparatus as defined in claim 38, wherein the memory key comprises an ignition key of a vehicle, the fluid delivery device comprises a fuel pump of the vehicle, and the fluid container comprises fuel lines leading to an engine of the vehicle." (Instrument No. 301-1, at 28 ¶ 4:57-61). Claim 40 relates to an "apparatus as defined in claim 39, wherein the means associated with the fluid delivery system for storing and retrieving information and the security means comprise ignition switch control circuitry of the vehicle." (Instrument No. 301-1, at 28 ¶ 4:62-65)

18

A18

The Defendants contend that claims 39 and 40 introduced brand new concepts not previously disclosed in the original patent: the notion that the "fluid delivery system" could be "a fuel pump of the vehicle" and the "fluid container" could be the vehicle's "fuel lines." *See* (Instrument No. 301-1, at 28 ¶ 4: 57-65). The Defendants argue that these claims should be invalidated because: (1) the addition of claims 39 and 40 broadened the scope of claim 22 and claims cannot be enlarged in any respect during reexamination to cover new or different subject matter, *see* (Instrument No. 309, at 36), and (2) patentees can only amend or add new claims during reexamination for limited purpose of distinguishing the invention as claimed from the prior art or in response to a decision adverse to the patentability of a claim of a patent, however, the amendments here were not designed to serve either of the recognized purposes of amendment during reexamination and thus are invalid. (Instrument No. 309, at 38) (citing 35 U.S.C. § 305).

Plaintiff argues that: (a) under the doctrine of claim differentiation the amended dependent claims 39 and 40 are presumed to be narrower than the independent claim 22; (b) the PTO office reviewed the amended claims and allowed them therefore the court should defer to the PTO's judgment; (c) the Defendants' have not shown by clear and convincing evidence that the dependent claims 39 and 40 are invalid.

The meaning of "fluid container" is construed in Section IV. A., *infra*. In summary, the Court concluded that the term "fluid container" refers to a "reservoir for storing fluid." Although, the literal meaning of the term "fluid container" could accommodate the "fuel lines" within a car, when the term "fluid container" is read in the context of the entire patent, it is clear that "fuel line" would not qualify as a "fluid container" as the term was used in the original patent. The specification explains that the patented invention was designed to facilitate the exchange information "between a container, such as a fuel or other liquid storage tank, and a fluid delivery system." *See* (Instrument No. 309-1, at 16 ¶ 1:5-10). This suggests that a "fluid container" was thought of as a receptacle designed for the primary

purpose of storing fluid. *See also* (Instrument No. 301-1, at 16 ¶ 4:37-45; 22 ¶ 15: 14-15). Although fuel lines have the capacity to store fuel as the fuel is being transported to other sections of the vehicles, they are not designed for the primary purpose of storing fluids. Therefore, when the patent was first approved fuel lines would not qualify as fluid containers.

The specification further explains that "a feature of the present invention is to provide a fluid delivery control system which is automatically activated when a fluid delivery nozzle is inserted into the corresponding input orifice of a fluid container." (Instrument No. 301-1, at 15 ¶ 1:67- 2:2). The internal fuel lines of car do not have an input orifice designed to receive fluid. This shortcoming would frustrate the invention's goal of automatically disabling "fluid delivery if the delivery nozzle is removed from the corresponding input orifice of the authorized container." (Instrument No. 301-1, at 15 ¶ 2:24-26). When read in context, the Court concludes that the term "fluid container" was not intended to encompass "fuel lines".

Plaintiffs' arguments that under the doctrine of claim differentiation dependent claims are "presumed" to be narrowing misstates the doctrine. (Instrument No. 315, at 4-6). Under the doctrine of claim differentiation, each claim in a patent is presumptively different in scope. *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2000). The doctrine is applicable where there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims." *RF Delaware, Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1263 (Fed. Cir. 2003). This doctrine, of course, relies on an assumption that the dependent claim is, in fact, proper, i.e., narrowing in nature. *Id.* This does not, however, mean that all dependent claims are proper and narrowing. *See e.g. Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1291-92 (Fed. Cir. 2006). The Federal Circuit has informed courts that "claim differentiation cannot be relied upon to 'broaden claims beyond their correct scope.'" *Wenger*, 239 F.3d at 1233. In this case, the Court has already explained that the dependent claims 39 and 40

attempt to broaden the scope of the claim 22 by defining a fuel line as a fluid container. Because the dependent claims seek to broaden the scope of the independent claim, the plaintiff cannot rely on the doctrine of claim differentiation to save claims 39 and 40 from invalidity. *See Wenger*, 239 F.3d at 1233. Moreover, "claim differentiation is not a 'hard and fast rule of construction,'" *Wenger*, 239 F.3d at 1233. Therefore, when a dependent claim is added years after the filing date of the original patents, as is the case here, a court may decline to apply the doctrine of claim differentiation. *See ICU Med. Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376 (declining to apply the doctrine of claim differentiation to a dependent claim added years after the filing dates of the original patents).

Equally unavailing are plaintiff's arguments that the Patent Office looked at and allowed the amended claims; therefore, the court should defer to the PTO's determination. The Federal Circuit has made clear that while "courts may take cognizance of, and benefit from, the proceedings before the patent examiner, the question [of claim scope] is ultimately for the courts to decide, without deference to the ruling of the patent examiner." *Quad Environmental Tech. v. Union Sanitary Dist.*, 946 F.2d 870, 876 (Fed. Cir. 1991).

Because the claims asserted in the amended claims 39 and 40 contain within their scope apparatuses that would not have infringed the original patent, the claims are impermissibly broad. *See Creo Prods.*, 305 F.3d at 1344. Accordingly, claims 39 and 40 are invalid. *Predicate Logic*, 544 F.3d at 1302.

## IV.

The Court will now apply these general principles of claim construction to the terms at issue here.

### A.

#### 1. Claim 22, Term No. 1: "fluid delivery system"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| fluid delivery transaction | The term does not require construction | A commercial exchange involving delivery of fluid |

**a.**

The first disputed term is "fluid delivery transaction". The term is used throughout claim 22, but features prominently in the preamble to claim 22. *See* (Instrument No. 301-1, at 24- 25). According to the Plaintiff, the ordinary and customary meaning of this claim term is plain and therefore does not require further construction. *See* (Instrument No. 301, at 11).

The Defendants, however, argue that the term "fluid delivery transaction" describes the delivery of fluid to a vehicle, such as from a refueling station, and not the movement of fluid within a vehicle from its fuel tank to its engine. *See* (Instrument No. 309, at 12). As such, the Defendants propose the term be defined as a "commercial exchange involving the delivery of fluid." *See* (Instrument No. 309, at 12). The Defendants contend that their proposed construction defines "transaction" in accordance with both its ordinary meaning of the term and with the patent specification. Specifically, the Defendants argue that every description of every embodiment in the '819 patent confirms that a fluid delivery transaction is intended to mean a commercial exchange. *See* (Instrument No. 309, at 12). As such, the Defendants contend that their proposed definition is consistent with the intrinsic record and adds clarity to a term that the Plaintiff does not otherwise define. *See* (Instrument No. 309, at 12).

Plaintiff counters that the Defendants' proposed definition for "fluid delivery transaction" improperly adds in limitations from a preferred embodiment that would exclude other embodiments. (Instrument No. 301, at 13). Specifically, the Plaintiff argues that the Defendants' proposed definition

requires that the "fluid delivery transaction" be commercial; this commercial requirement limits the independent claim too narrowly to encompass the embodiment specifically claimed in dependent claims 39 and 40. (Instrument No. 301, at 12-13). Finally, the Plaintiff argues that the Defendants' proposed definition is cumbersome and imprecise. *See* (Instrument No. 301, at 12).

Defendants respond that Plaintiff is effectively seeking to rewrite the claim term such that "fluid delivery transaction" simply reads "fluid delivery." *See* (Instrument No. 309, at 14). This, they, argue renders the word "transaction" superfluous in contravention of basic tenets of claim construction law. *See* (Instrument No. 309, at 14). Thus, in order to afford the word "transaction" some meaning, the term "fluid delivery transaction" must be defined as "a commercial exchange involving delivery of fluid." *See id.*

### b.

With respect to the term "fluid delivery transaction," the parties' dispute centers on the definition of the word "transaction." When construing a term, the language of a claim provides the starting point in a claim construction analysis. *See Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1464 (Fed. Cir. 1998). "Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning." *Renishaw PLC*, 158 F.3d at 1249. In this case, the ordinary and customary meaning of the word "transaction" contemplates a commercial exchange. *See* Merriam Webster, *Webster's Third New International Dictionary: Since 1847 the Ultimate Word Authority for Schools, Libraries, Courts, Homes, and Offices* 2002 (defining transaction as an exchange or transfer of goods or services).

This interpretation is further supported by the patent specification. In the patent specification, the patentee states that a feature of the present invention is to: (a) to receive and record information about the price of fluid, quantity and type of fluid being delivered, the time and date of the fluid delivery while completing a fluid delivery transaction, (Instrument No. 301-1, at 15 ¶ 1:30-46); (b) positively "identify

the fluid container for security and billing purposes to help prevent the delivery of fluid to unauthorized containers," (Instrument No. 301-1, at 15 ¶ 2:3-6); (c) automatically "pay[] for delivered fluid without the use of an identification card or other like device," (Instrument No. 301-1, at 15 ¶ 2:7-9) and; (d) to authorize and memorialize "a fluid delivery transaction that can be wholly controlled by an absent purchaser of the fluid." (Instrument No. 301-1, at 15 ¶ 2:21-23). These descriptions all evince a commercial context. Elsewhere in the specification, the patentee states that the purpose of the invention was to ensure that accurate records were maintained for vehicles that were operated as part of a commercial enterprise and to ensure that the miles logged on such vehicles corresponded to commercial, not private use. *See* (Instrument No. 301-1, at 15 ¶ 1:16-26). "When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2008).

Plaintiff's argument that the Defendants' proposed construction would exclude the embodiments included in claims 39 and 40 is unpersuasive in light of the Court's earlier ruling that those claims were invalid.

On the whole, the Defendants' construction comports with the plain and ordinary meaning of the word "transaction", is consistent with the teachings of the patent specification, and gives meaning to every word in the challenged term *See Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (noting that claim construction should strive to give meaning to every word in the claim). Plaintiff's argument that the Defendants' proposed construction would exclude the embodiments included in claims 39 and 40 is unpersuasive in light of the Court's earlier ruling that those claims were invalid. Accordingly, the Court adopts the Defendants' proposed construction.

24

A24

### 2.    Claim 22, Term No. 2: "fluid container"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| fluid container | The term does not require construction | A reservoir for storing fluid |

**a.**

The second disputed term is "fluid container." The term is used throughout claim 22, but features prominently in the preamble to claim 22. *See* (Instrument No. 301-1, at 24- 25). According to the Plaintiff, the ordinary and customary meaning of this claim term is plain and therefore does not require further construction. *See* (Instrument No. 301, at 11).

The Defendants proposes that the term "fluid container" be defined as "a reservoir for storing fluid." *See* (Instrument No. 309, at 15). The Defendants contend that the proposed definition comports with both the plain meaning of the term and the patent specification, which describes the invention as relating "to an apparatus for controlling the delivery of fluid to a container or a reservoir" that transmits information between the "container, such as a fuel or other fluid storage tank." *See* (Instrument No. 309, at 15) (citing Instrument No. 309-1, at 16 ¶ 1:5-10).

Plaintiff responds that the Defendants' proposed definition is cumbersome and imprecise. (Instrument No. 301, at 12). Specifically, the Plaintiff argues that the term "fluid container" provides more clarity to a lay person that then Defendants' definition. *See* (Instrument No. 301, at 13).

**b.**

The starting point for claim construction is the "ordinary and customary meaning" of the term. *See Phillips*, 415 F.3d at 1312-13. A container is commonly defined as "a receptacle for holding or carrying material." *See* Webster's II New Riverside Dictionary 304 (2d. ed. 1984). Thus, Defendants' proposed construction is in keeping with the ordinary and customary meaning of the term. Moreover, the Defendants' construction comports with the teachings of the patent specification. The patent specification describes the invention as relating to "an apparatus for controlling the delivery of fluid to a container or reservoir." *See* (Instrument No. 309-1, at 16 ¶ 1:5-10). The specification further explains that the apparatus is designed to exchange information "between a container, such as a fuel or other

A25

liquid storage tank, and a fluid delivery system." *See id.* Thus, the Defendants' proposed construction is anchored in the teachings of the specification. Accordingly, the Court adopts the Defendants' proposed construction.

### 3.    Claim 22, Term No. 3: "fluid delivery system"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| fluid    delivery system | The term does not require construction | A system that transfers fluid from an external source to fluid containers |

**a.**

The third disputed term is "fluid delivery system" The term is used throughout claim 22, but features prominently in the preamble to claim 22. *See* (Instrument No. 301-1, at 24- 25). According to the Plaintiff, that the term is easily understood and does not require further construction. *See* (Instrument No. 301, at 11).

Defendants, however, argue that the intrinsic record clearly indicates that a delivery system is a system that delivers fluid to vehicles, and never within a vehicle. *See* (Instrument No. 309 at 16). Thus, the Defendants argue that the term "fluid delivery system" should be defined to mean " a system that transfers fluid from an external source to fluid containers." *See* (Instrument No. 309, at 16).

Plaintiff, however, contends that Defendants' proposed definition for "fluid delivery system" improperly adds in limitations from a preferred embodiment that would exclude other embodiments. (Instrument No. 301, at 13). Specifically, the Plaintiff claims that the Defendants' proposed definition adds a limitation that the fluid delivery system must transfer fluid from an external source to fluid containers. This limitation, however, would exclude the preferred embodiment claimed in Claim 39 which states that the fluid container comprises fuel lines leading to an engine of the vehicle, indicating that the fluid delivery system is entirely internal, and not "a system that transfers fluid from an external source to fluid containers", as the Defendants have proposed. *See* (Instrument 301, at 13). The Plaintiff further contends that the Defendants' proposed definition is cumbersome and imprecise. (Instrument No. 301, at 12).

A26

**b.**

In this case, the claim language does not provide any further elaboration on the scope of the challenged terms. However, when the claim is read in the context of the patent specification, *see Phillips*, 415 F.3d at 1315, it becomes clear that the term "fluid delivery system" contemplates a system that transfers fluid from an external source. In the patent specification, the patentee explains that "a feature of the present invention is to provide a fluid delivery control system which is automatically activated when a fluid delivery nozzle is inserted into the corresponding input orifice of a fluid container." (Instrument No. 301-1, at 15 ¶ 1:67- 2:2). The patent further teaches that another "feature [of the present invention] is an automatic disabling of the fluid delivery if the delivery nozzle is removed from the corresponding input orifice of the authorized container." (Instrument No. 301-1, at 15 ¶ 2:24-26). The fluid delivery nozzle, which is external to the vehicle, is inserted into the input orifice of a fluid container, which is part of a vehicle, to facilitate a fluid delivery. Thus, the system contemplates fluid flowing from an external source to the vehicle, rather than within vehicle. When a patent "describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon*, 503 F.3d at 1308. Thus this passage of the patent specification strongly suggests that "fluid delivery system" was intended to describe a system that transfers fluid from an external source to the vehicle.

This reading is confirmed in other passages of the specification. Elsewhere in the specification, the patentee writes: (a) "when the fluid delivery system is delivering, e.g., a petroleum-based fuel to a vehicle, usually via a fuel nozzle inserted into a fuel orifice of the vehicle, *see* (Instrument No. 301-1, at 15 ¶ 1:55-58); (b) "it is also desirable to control refueling operations so that fuel delivered to the vehicle is properly recorded and charged" *see* (Instrument No. 301-1, at 16 ¶ 3:20-22) (emphasis added); (c) "the fuel pump module 24 may be directly connected to a station computer or pump controller 30 which will subsequently transmit the information, e.g., over telephone lines, to the owner of the truck tractor 12

27

and, in certain circumstances, to the appropriate financial institution for payment to the fuel pump owner
for the fuel delivery made to the truck tractor," *see* (Instrument No. 301-1, at 17 ¶ 5:17-24) (emphasis
added); (d) "the operator will then insert the fuel nozzle of the fuel pump into the filler neck of the fuel
tank," *see* (Instrument No. 309-1, at 20 ¶ 10:56-58). Accordingly, the Court adopts the Defendants'
proposed construction.

Plaintiff's argument that the Defendants' proposed construction would exclude the embodiments
included in claims 39 and 40 is unpersuasive in light of the Court's earlier ruling that those claims were
invalid.

### B.

Claim 22 patent lists four elements, terms 4-7, which are  presumptively drafted in the "means-
plus-function" format[4]: (1) "personal identification means for generating an identification signal
identifying the person"; (2) "means associated with the fluid delivery system for storing and retrieving
information and capable of being operatively linked to said personal identification means"; (3)
"information communication means linking said fluid delivery system information means and said
personal identification means"; and (4) "security means associated with said storage and retrieval device
for verifying said identification signal prior to the delivery of fluid to the fluid container." (Instrument
No. 301-1, at 24-25).

As mentioned earlier, courts considering means-plus-function expressions must first decide what
the claimed function is, and then must determine whether a structure corresponding to that function is
disclosed in the specification. *Welker Bearing*, 550 F.3d at 1097; *Minks*, 546 F.3d at 1377. Thus, the
analysis below first interprets the parties' proposed functional definitions and then proceeds to the
parties' proposed structural definitions.

---

[4] If the word "means" appears in a claim element in association with a function then the court presumes that the term is a
mean-plus-function term under 35 U.S.C. § 112. *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008);
*Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005).

1.   **Claim 22, Term No. 4:** "personal identification means for generating an identification signal identifying the person"

The parties agree that the term "personal identification means for generating an identification signal identifying the person" is a means-plus-function claim, governed by 32 U.S.C. § 112 ¶ 6. The Court concurs. *See Callicrate*, 427 F.3d at 1368. Accordingly, the patent must specify both the function and the structure of the claim. Here, the parties propose different definitions for both the function and the structure of the challenged term.

**a.**

| Claim Term | Plaintiff's Proposed Functional Construction | Defendants' Proposed Functional Construction |
|---|---|---|
| personal identification means for generating an identification signal identifying the person | generating an identification signal identifying the person | For generating a signal containing information that itself establishes the identity of the person requesting the fluid delivery transaction |

Plaintiff contends that the function of the term "personal identification mean for generating an identification signal identifying the signal" is expressly defined in the claim language as "generating an identification signal identifying the person." *See* (Instrument No. 301, at 15) (citing Instrument No. 301-1, at 24 ¶ 20: 65-66).

Defendants argue that the function of the term "personal identification mean for generating an identification signal identifying the signal" should be defined as "generating a signal containing information that itself establishes the identity of the person requesting the fluid delivery transaction." *See* (Instrument No. 309, at 17-18). According to the Defendants, their proposed definition gives meaning to the phrase "identifying the person". The Defendants contend that their construction assigns to this phrase its plain and ordinary meaning because the word "'identifying the person' refers to the process of determining someone's identity." *See* (Instrument No. 309, at 18) (*citing The American Heritage College Dictionary* 674 (3d. ed. 1993) (defining "identify" as "to establish the identity of")).

29

The core of the parties' dispute centers on whether the claim phrase "identification signal identifying the person" requires further construction. The Court concludes that it does. The Plaintiff's proposed construction, though stemming from the claim language, does not adequately describe the relationship between the "identification signal" language and the "identifying the person" language; it does not articulate the nexus between the identification signal and the person requesting the fluid. The Defendants' formulation provides greater clarity by acutely describing that relationship while also defining the language in accordance with its ordinary and customary meaning. *See* Webster's II New Riverside Dictionary 607 (2d. ed. 1984) (defining "identification" as "the act of identifying" and defining "identify" as "to establish the identity of").

Moreover, the Defendants' construction is firmly rooted in the patent specification, which teaches, in relevant part, that: (a) the patent includes a system for identifying either a fluid container or an authorized person which utilizes a passive identification module, *see* (Instrument No. 301-1, at 15 ¶ 2: 16-20); (b) when the passive identification module serves as identification device for a person, rather than a fluid container, the information stored on "the [programmable read-only memory device] would be information identifying the person," *see* (Instrument No. 301-1, at 23 ¶ 16: 19-24); (c) the passive identification module thus functions like an identification card [that]...can identify...an authorized person attempting to initiate a fuel delivery transaction," (Instrument No. 301, at 2323 ¶ 17: 28-34).

Finally, the Defendants' proffered definition is consistent with patent prosecution history. In the patent prosecution history, the Plaintiff states that the patent is distinguishable from the prior art because, unlike the prior art, the '819 patent disclosed a "personal identification means for generating an identification signal indentifying a person who is requesting fluid delivery transaction." *See* (Instrument No. 309-1, at 83-84). Moreover, in the reexamination of the patent, the patent examiner determined that claim 22 should be "confirmed because the prior art of record fails to have a personal identification means for generating an identification signal identifying the person who is requesting the fuel delivery."

A30

(Instrument No. 309-1, at 100). A "patent applicants' actions and arguments during prosecution, including prosecution in a reexamination proceeding, can affect the proper interpretation and effective scope of their claims." *Marine Polymer Techs., Inc. v. HemCon, Inc.* 672 F.3d 1350, 1365 (Fed. Cir. 2012). "Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372-373 (Fed. Cir. 2005).

On the whole, the Defendants' construction assigns the claim language its ordinary and customary meaning and coheres to the teachings of the specification and the prosecution history. Accordingly, the Court adopts the Defendants' proposed construction.

### b.

| Claim Term | Plaintiff's Proposed Functional Construction | Defendants' Proposed Functional Construction |
|---|---|---|
| personal identification means for generating an identification signal identifying the person | A programmable read-only memory device, a power receive coil, a signal transmitting coil, a phase shift key encoder and a modulator plus equivalents | A passive identification module that includes a memory that stores information that establishes the identity of the person |

Plaintiff contends that the structure associated with the means-plus-functional term "personal identification mean for generating an identification signal identifying the signal" is expressly defined in the patent specification as "a programmable read-only memory device, a power receive coil, a signal transmitting coil, a phase shift key encoder and a modulator plus equivalents" *See* (Instrument No. 301, at 15-16) (citing Instrument No. 301-1, at 15¶ 2:16-20; 22 ¶ 16: 15-19; 22 ¶ 16: 36-39; 22 ¶ 16: 47-51; 23 ¶ 17: 28-24).

Defendants argue that the structure of the term "personal identification mean for generating an identification signal identifying the signal" should be defined as "passive identification module that includes a memory that stores information that establishes the identity of the person." *See* (Instrument No. 309, at 20). According to the Defendants, their proposed definition gives meaning to the phrase

31

"identifying the person". The Defendants contend that the Plaintiff's proposed construction is incorrect because it ignores the fact that the memory must store information identifying the person in order to perform the recited function. *See* (Instrument No. 309-1, at 23 ¶ 16: 22-24) ("the information stored on the PROM 902 would be information identifying the person"). Thus, Defendants claim that there would be no way for the identification module to generate a signal "identifying the person" as required by claim 22. *See* (Instrument No. 309, at 21). The Defendants argue that the Plaintiff's proposed construction is also wrong for a second reason: the Plaintiff's proposed construction includes structures—namely, a power receiver coil, signal transmitting coil, phase shift key encoder, and modulator—that are not clearly linked to the claimed function. *See* (Instrument No. 309, at 21). Specifically, the Defendant contends that the Plaintiff's construction ignores fact that the signal transmitting coil, PSK encoder, and modulator are used to "transmit the information stored on the PROM." (Instrument No. 309-1, at 23 ¶ 16: 47-48). As such, they are only linked to transmitting a signal, and not the claimed function of "generating" an identification signal. *See* (Instrument No. 309) (citing Instrument No. 309-1, at 23 ¶ 16: 47-48) (emphasis supplied).

Plaintiff contends that the Defendants' proposed structure is not, as stated, found in the specification, and seemingly relies on extrinsic evidence. *See* (Instrument No. 301, at 16). Thus, Plaintiff argues that the Defendants' approach should be rejected. *See id.*

Here, the Plaintiff's proposed structure lists the components of a passive identification module. The patent specification makes clear that a passive identification module "may serve as an identification device for a person [or] a fluid container." *See* (Instrument No. 301-1, at 22 ¶ 16: 20-23). The specification further provides that when the passive identification module is used an identification device for a person (requesting a delivery transaction), then the "programmable read only memory device" comprising the module will store "information identifying the person." (Instrument No. 301-1, at 22 ¶ 16: 20-23). That information is then transmitted, via signal, to a controller associated with the

fuel delivery system. *See* (Instrument No. 301-1, at 22 ¶ 16: 36- 68). Because a passive identification module may be used to identify either a person or a container, a structure that merely recites the components of a passive identification module does not adequately link the passive identification module (or its components) with the function of "generating a signal that establishes the identity of *the person* requesting the fluid delivery transaction." *See Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009) ("[C]laims written in means-plus-function form must disclose the *particular* structure that is used to perform the recited function."). Thus, the Plaintiff's construction is flawed.

The Defendants' structure, however, clearly states that the memory device comprising the passive identification module must store information that establishes the identity of the person requesting the fluid delivery transaction. As such, this structure is more closely linked to the function of "generating a signal that establishes the identity of *the person* requesting the fluid delivery transaction." Accordingly, the Court adopts the Defendants' proposed construction.

**2. Claim 22, Term No. 5:** "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means"

The parties agree that the term "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means" is a means-plus-function claim, governed by 32 U.S.C. § 112 ¶ 6. The Court concurs. *See Callicrate*, 427 F.3d at 1368. Accordingly, the patent must specify both the function and the structure of the claim. Here, the parties propose different definitions for both the function and the structure of the challenged term.

a.

| Claim Term | Plaintiff's Proposed Functional Construction | Defendants' Proposed Functional Construction |
|---|---|---|
| Means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means | Storing and retrieving information | For storing and retrieving information and capable of being operatively linked to the personal identification means |

Plaintiff contends that the function of the term "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means" is expressly defined in the claim language as "storing and retrieving information." *See* (Instrument No. 301, at 15); (Instrument No. 301-1, at 24 ¶ 20: 67- 25 ¶ 21:4).

Defendants argue that the function of the term "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means" should be defined as "for storing and retrieving information and capable of being operatively linked to the personal identification means." *See* (Instrument No. 309, at 17-18). According to the Defendants, their proposed definition gives meaning to the phrase "and capable of being operatively linked to said personal identification means." Defendants argue that Plaintiff's proposed construction does not give meaning to the phrase "and capable of being operatively linked to said personal identification means" and effectively purges the phrase from the claim term. *See* (Instrument No. 309, at 22).

Plaintiff retorts that the challenged term must be read in context. According to the Plaintiff, the phrase "and capable of being operatively linked to said personal identification means" is included in the challenged term to describe one capability of the storing and retrieving means, but the phrase is not related to the function of the storing and retrieving means. *See* (Instrument No. 301, at 16).

For this term, the dispute between the parties revolves around whether the phrase "capable of being operatively linked to said personal identification means," which is included in the challenged term is a functional limitation or whether it is simply a capability of the storing and retrieving means. When read in context, the Court finds that the term is not a functional limitation on the storage and retrieval means, but rather is a capability. Although it's true the storage and retrieval means is designed such that it can be operatively linked to the personal identification means, this is not the purpose of the storage and retrieval means. The purpose is to provide storage and to retrieve information. Accordingly, the Court adopts the Plaintiffs' proposed construction.

b.

| Claim Term | Plaintiff's Proposed Structural Construction | Defendants' Proposed Structural Construction |
|---|---|---|
| Means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means | A central processing unit, memory and a data bus plus equivalents | A fuel pump module of a service station, pump truck, or stationary tank that includes a central processing unit and a non-volatile memory |

Plaintiff contends that the structure of the means-plus-function term "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means" is "a central processing unit, memory and a data bus plus equivalents" *See* (Instrument No. 301, at 17).

Defendants argue that the structure of the means-plus-function term "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means" should be defined as "a fuel pump module of a service station, pump truck, or stationary tank that includes a central processing unit and a non-volatile memory." *See* (Instrument No. 309, at 17-18). According to the Defendants the '819 patent specification only describes three structures—a refueling station, a pump truck, and a stationary tank—that both "store and retrieve

A35

information" and are "capable of being operatively linked to the personal identification means." *See* (Instrument No. 309, at 23) (citing Instrument No. 309-1, at 20 ¶ 9:18-36 [fuel pump module]; 22 ¶ 14:15-37 [pump truck module]; 23 ¶ 15:4-18 [stationary tank module]).

Plaintiff argues that the Defendants' structure associated with this function is not and cannot be linked to any specific type of fluid that is being delivered, thus the Defendants' attempt to limit the term to "a fuel pump module of a service station, pump truck, or stationary tank that includes a central processing unit and a non-volatile memory" improperly limits the claim to examples contained in a preferred embodiment. *See* (Instrument No. 301, at 17). Moreover, the Plaintiff argues that the Defendants' construction is improper because it would exclude the embodiment claimed in the amended claim 39. Thus, the court should reject the Defendants' proposed construction.

In this case, the function of the claim term is to "store and retrieve." The Plaintiff's proposed structure of "a central processing unit, memory, and data bus" is capable of performing the function of "storing and retrieving" and is sufficient to qualify as a corresponding structure. *See Katz Interactive Call Processing Patent Litig. v. Am. Airlines,* 639 F.3d 1303, 1316 (Fed. Cir. 2011) (The "functions of 'processing,' 'receiving,' and 'storing' are coextensive with the structure disclosed, i.e., a general purpose processor."). Accordingly, the Court adopts the Plaintiff's proposed construction.

3.  **Claim 22, Term No. 6:** "information communication means linking said fluid delivery system information means and said personal identification means"

The parties agree that the term "information communication means linking said fluid delivery system information means and said personal identification means" is a means-plus-function claim, governed by 32 U.S.C. § 112 ¶ 6. The Court concurs. *See Callicrate,* 427 F.3d at 1368. Accordingly, the patent must specify both the function and the structure of the claim. Here, the parties propose different definitions for both the function and the structure of the challenged term.

**a.**

36

| Claim Term | Plaintiff's Proposed Functional Construction | Defendants' Proposed Functional Construction |
|---|---|---|
| Information communication means linking said fluid delivery system information means and said personal identification means | Linking said fluid delivery system information means and said identification means | For the communication of information between the fluid delivery system information means and the personal identification means |

Plaintiff contends that the function of the term "information communication means linking said fluid delivery system information means and said personal identification means" is expressly defined in the claim language as "linking said fluid delivery system information means and said identification means." *See* (Instrument No. 301, at 17); (Instrument No. 301-1, at 25 ¶ 22: 1-3).

Defendants argue that when language preceding the "means for" clause is purely functional, that language is properly construed to be part of the element's functional recitation. *See* (Instrument No. 309, at 24) (citing *Baran v. Med. Device Techs.*, 616 F.3d 1309, 1317 (Fed. Cir. 2010) (finding that the claim term "release means for retaining the guide in a charged position" recited both a release function and a retention function)). Defendant's argue that the phrase "information communication" is purely functional and given that it precedes the "means for" clause the phrase "information communication" should be construed as part of the function of the claim. *See* (Instrument No. 309, at 24). Thus, Defendant's argue that the Plaintiff's proposed construction of the function ignores the purely functional language of "information communication," and would broaden the claim by requiring only a means for linking the fluid delivery system means and the personal identification means. *See* (Instrument No. 309, at 24).

Plaintiff argues that the function of this requirement is merely to link the fluid delivery system with the identification method. Thus Defendants' interpretation unnecessarily includes "communication" as part of the function of the term. *See* (Instrument No. 315, at 16).

The Court agrees with the Defendants' reading of *Baran v. Med. Device Techs.*, 616 F.3d 1309, 1317 (Fed. Cir. 2010); when language preceding the "means for" clause is purely functional, that

A37

language is properly construed to be part of the claim language's functional recitation. In this case, the phrase "information communication" is a purely functional term preceding the words "means" and therefore should be construed as part of the element's functional recitation. *See Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1356 (Fed. Cir. 1999) (construing "ink delivery means" to be equivalent to "means for ink delivery" because "ink delivery" was purely functional language). Moreover, the Defendants' construction gives meaning to every word in claim language. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim."); *accord Cohesive Technologies, Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008). Accordingly, the Court adopts the Defendants' proposed construction.

**b.**

| Claim Term | Plaintiff's Proposed Structural Construction | Defendants' Proposed Structural Construction |
|---|---|---|
| Information communication means linking said fluid delivery system information means and said personal identification means | A coil capable of transmitting a signal and a coil capable of receiving a signal | A signal transmitting coil and a signal receiving coil |

Plaintiff argues that the structure associated with the recited function is "a coil capable of transmitting a signal and a coil capable of receiving a signal." (Instrument No. 301, at 17). Defendant counters that the structure associated with the recited function is "a signal transmitting coil and a signal receiving coil." According to the Defendants, the patent requires two separate coils: one which transmits and one which receives. *See* (Instrument No. 309-1, at 23 ¶ 16: 47-57) (disclosing "signal transmitting coil 916" and "signal receiving coil 1012"). Since this is the only proposed structured contained in the specification, this is the only possible structure associated with the recited function. *See* (Instrument No. 309, at 25).

Defendants' identified structure is similar to Plaintiff's; the only difference being that the Defendants contend that the corresponding structure must include a system of two coils rather than one

coil, as Plaintiff argues. Although the portion of the specification cited to by Defendants, does indeed describe a "signal transmitting coil" and a "signal receiving coil." *See* (Instrument No. 309-1, at 23 ¶ 16: 47-57), in the section of the patent describing the vehicle identification module, the patentee does state that the "signal transmitting coils" that is "coils 26, 76, 80 and 81 can also function as receiver." *See* (Instrument No. 309-1, at 18 ¶ 6: 52-53). While its true that this passage describes the mechanism associated with the vehicle identification module, rather than the personal identification module, at issue, it nevertheless suggests that two coils are not an absolute necessity to perform the recited function. In construing claims, the Court avoids "structural limitations from the written description that are unnecessary to perform the claimed function." *Wegner*, 239 F.3d at 1233. As such, the Court adopts the Plaintiff's construction.

### 4. Claim 22, Term No. 7: "security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container"

The parties agree that the term "security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container" is a means-plus-function claim, governed by 32 U.S.C. § 112 ¶ 6. The Court concurs. *See Callicrate*, 427 F.3d at 1368. Accordingly, both the function and the structure of the term must be identified. Here, the parties agree that the function of "security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container" should be construed as "verifying said identification signal prior to the delivery of fluid to the fluid container". *See* (Instrument No. 301, at 18; Instrument No. 309, at 25). Thus, the disputed issue is whether the patent discloses a corresponding structure.

a.

| Claim Term | Plaintiff's Proposed Functional Construction | Defendants' Proposed Functional Construction |
|---|---|---|
| Security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container | Verifying said identification signal prior to the delivery of fluid to the fluid container **(AGREED)** | Verifying said identification signal prior to the delivery of fluid to the fluid container **(AGREED)** |

b.

| Claim Term | Plaintiff's Proposed Structural Construction | Defendants' Proposed Structural Construction |
|---|---|---|
| Security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container | A signal receiving coil, a demodulator and a phase shift key decoder plus equivalents | The specification does not disclose sufficient structure for performing the recited function and therefore claim 22 is invalid at least under 35 U.S.C. § 112. |

Plaintiff argues that the structure associated with the recited function is "a signal receiving coil, a demodulator and a phase shift key decoder plus equivalents." (Instrument No. 301, at 18). Defendant counters that "the specification does not disclose sufficient structure for performing the recited function and therefore claim 22 is invalid." (Instrument No. 309, at 26). According to the Defendants, the specification of the '819 patent does not disclose any structure for performing the function of "verifying said identification signal prior to the delivery of fluid to the fluid container." The specification does not use the terms "verify," "verifying," or "verification" at all. Thus, the Defendants contend that, because the specification does not even discuss the actual claimed function, it certainly does not link a structure to that function. *See* (Instrument No. 309, at 26).

When the patentee employs means-plus-function language in a claim, he must set forth in the specification an adequate disclosure showing what is meant by that language. If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the patentee

40

will have failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112, which renders the claim invalid for indefiniteness. *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed Cir. 2009). However, the written description need not explicitly describe the corresponding structure. *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1381-82 (Fed. Cir. 1999). If the written description contains an implicit description that a person of ordinary skill in the art would recognize as performing the recited function, the statutory requirement is satisfied. *Id.*

In this case, the specification states, in part: "The coil 1012 may be any of the coils…The signal from the demodulator 1010 passes through a low pass filter 1016 and through a phase shift key decoder 1018 to a shift register 1020 which is connected to the data bus of any of the CPUs…depending on the application." (Instrument No. 301-1, at 22 ¶ 16:53-58). In addition, Figure 12 in the patent specification illustrates the structure described above.

*FIG.12*



41

A41

The patent teaches that the structure detailed in Fig. 12 is used with the passive identifier module. *See* (Instrument No. 301-1, at 16 ¶ 3:1-3). In Fig. 12, "the active communication module has a corresponding set of components – namely a receiving coil 1012, demodulator 1010 and PSK decoder 1018 – that are used to receive an identification signal being transmitted by the personal identification module. *See* (Instrument No. 301-1, at 22 ¶ 16:53-58).

The Plaintiff essentially argues that the receipt of the identification signal from the personal identification module implies verification. Although this structure teeters on the cusp of indefiniteness, the defendants have not demonstrated by clear and convincing evidence that the structure is indefinite. *See Tech. Licensing*, 545 F.3d at 1338. (noting that to the extent there are any factual findings upon which a trial court's indefiniteness conclusion depends, they must be proven by the challenger by clear and convincing evidence). The specification indicates that the structure proposed enables the transmission of an identification signal from one module to another, it does not, however, expressly associate the "transmission or receipt" of such signals with the "verification" of such signals. However, the patent specification does state that "upon initiation of a fluid delivery transaction a communication link is established between the passive identification and active communication modules and will proceed only if appropriate authorization is received by the active communication module and an associated information storage retrieval device." (Instrument No. 301-1, at 2). Because verification of the signal is performed to facilitate the fluid delivery, one skilled in the art would understand that the receipt of the identification signal serves to verify the signal, such that the receipt of the identification signal from the personal identification module implies verification of the signal. The patent thus links the structure described above with the claimed function. The defendants have not offered clear and convincing evidence that one skilled in the art would not interpret the above-mentioned passages of the specification as providing the structure for the verification function. Accordingly, the Court concludes that the Plaintiff has articulated a corresponding structure.

## C.

**1.       Claim 22, Term No. 8: "for the transmission of operational energy for said personal identification means"**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| For the transmission of operational energy for said personal identification means | For the transmission of power to the personal identification means | For the transmission of power to the personal identification means which has no independent battery or other power source |

**a.**

The eighth disputed term is "for the transmission of operational energy for said personal identification means". The term is featured in claim 22. *See* (Instrument No. 301-1, at 25 ¶ 21:6-11). At the *Markman* hearing, the Plaintiff argued that the term should be defined to mean "for the transmission of power to the personal identification means." The Defendants argue that the disputed term "for the transmission of operational energy for said personal identification means" should be defined as "for the transmission of power to the personal identification means which has no independent battery or other power source." *See* (Instrument No. 309, at 29). According to the Defendants, claim phrase "operational energy" on its face plainly refers to the energy needed to operate something. Moreover, the Defendants argue that when the claim language is read in the context of the patent specification, it is clear that a module that receives its "operational energy" from an RF signal does not have a battery or other power source. *See* (Instrument No. 309, at 30) (citing to Instrument No. 309-1, at 3; 16 ¶ 2:16-20; 23 ¶ 16:8-11).

**b.**

"[C]laims must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315. In this case, the patent specification clearly provides that the claim phrase "operational energy" refers to power to the personal identification means, which does not have its own power source. In the abstract of the patent, the patentee states that the term the personal identification module "has no independent battery of power source but receives its operational energy from an RF signal." (Instrument

No. 309-1, at 3). Similarly, in the section titled Summary of the Invention, the patentee describes the patent as including "a system for identifying either a fluid container or an authorized person which utilizes a...identification module that has no independent power source but receives its operational energy from an RF signal generated by the fluid delivery device." (Instrument No. 309-1, at 16 ¶ 2:16-20) (emphasis added). Finally, in the patent's Detailed Description of a Preferred Embodiment section, the patentee states that the personal "identification module has no independent battery or other power source. Operational energy is received from an active communication module" (Instrument No. 309-1, at 23 ¶ 16:8-11). In keeping with the teachings of the patent specification, the Court adopts the Defendants' proposed construction.

    **2.    Claim 22, Term No. 9: "information regarding the fluid delivery transaction is stored"**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Information regarding the fluid delivery transaction is stored | The term does not require construction | Information relating to a commercial exchange involving delivery of fluid, such as price of fluid, type of fluid, date and quantity of delivery, that is memorialized for record keeping purposes |

**a.**

The ninth disputed term is "information regarding the fluid delivery transaction is stored." The term is featured in claim 22. *See* (Instrument No. 301-1, at 25 ¶ 21:8-10). According to the Plaintiff, that the term is easily understood and does not require further construction. *See* (Instrument No. 301, at 14).

Defendants, however, argue that the plain meaning of the words, "information regarding the fluid delivery transaction" does not refer to information regarding a vehicle, or even information regarding fluid delivery, but rather it "means information regarding the fluid delivery transaction itself—that is, the commercial exchange involving delivery of fluid." (Instrument No. 309, at 30). Thus, the Defendants argue that the term should be defined to mean "information relating to a commercial exchange involving delivery of fluid, such as price of fluid, type of fluid, date and quantity of delivery, that is memorialized

44

for record keeping purposes." (Instrument No. 309, at 29). According to the Defendants, this definition is confirmed by the patent specification which describes the information "regarding the fluid delivery transaction" to include, for example, "customer identification, authorization codes and credit account information attendant to a fuel or other fluid delivery transaction." (Instrument No. 309, at 30) (citing Instrument No. 309-1, at 22 ¶ 15:32-35).

The Plaintiff replies that the Defendants' construction improperly imports limitations from a specific, preferred embodiment described in the specification. *See* (Instrument No. 301, at 19). Namely, that the type of information listed in the Defendants' proposed construction is but an example of the kinds of information the invention could store. *See* (Instrument No. 301, at 20). According to the Plaintiff, the list does not represent the entirety of the information that could be stored by the invention. *See id.* The Plaintiff also argues that the Defendants' definition is improper because it states that the information "relat[es] to a commercial exchange," *See* (Instrument No. 301, at 20). In the Plaintiff's view, this "commercial exchange" requirement would exclude the embodiments claimed in claims 39 and 40, which relate to the delivery of fluid within a car rather than to a car from an external source.

### b.

The Defendants' proposed construction is untenable for two reasons. First, the Defendants seek to add examples of the type of information stored—i.e. "price of fluid, type of fluid, date and quantity of delivery"—as part of the definition. This is improper because: (a) these are examples, they do not represent the entire universe of data that could be stored, *see* (Instrument No. 301-1, at 15 ¶ 1:36-39) (listing a more complete list of types of information stored) and (b) importing examples into the definition may cause the trier-of-fact to mistakenly limit the type of information stored to the examples listed in the definition. Secondly, the Defendant seeks to define the word "stored" to mean "memorialized for record keeping purposes". The Court disagrees. The Defendants' construction is too narrow, nothing in the intrinsic record suggests that the information regarding the fluid delivery

transaction was to be "memorialized [only] for record keeping purposes". Therefore, the "stored" will be defined in accordance with its ordinary meaning. *Wegner*, 239 F. 3d at 1232. In this case, the ordinary meaning of the word "stored" is plain and obvious to one skilled in the art and the layman. Thus, the court need not construe it. *O2 Micro Int'l ltd., v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). In keeping with the earlier interpretation of the term "fluid delivery transaction" the Court construes the term "information regarding the fluid delivery transaction is stored" to mean "information relating to a commercial exchange involving delivery of fluid is stored."

**D.**

**1.     Claim 38 and 39, Term No. 10: "memory key"**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Memory key | The term does not require construction | A memory module that is physically connected to a device to exchange data. |

**a.**

The tenth disputed term is "memory key." The term is featured in claim 38 and 39. *See* (Instrument No. 301-1, at 25 ¶ 21:8-10). According to the Plaintiff, the patentee has not acted as his own lexicographer by providing specialized definitions for the term "memory key", thus the term should be construed according to is ordinary meaning. The Plaintiff further contends that the plain meaning of the term is easily understood and therefore the term does not require further construction. *See* (Instrument No. 301, at 20).

Defendants propose that the term "memory key" refers to "a memory module that is physically connected to a device to exchange data." The Defendants' construction is fashioned from portions of the patent specification. Specifically, the Defendants' definition relies on portions of the patent specification describing a preferred embodiment which describe the operator as "insert[ing] the memory key into an appropriate receptacle." *See* (Instrument No. 309-1, at 20 ¶ 10:45-47). This, the Defendants argue, demonstrates that the memory key is physically connected to a device. Another passage of the patent

46

specification describes the memory key as memory key available from Datakey Corporation, Burnsville, Minn., or a passive transponder <u>with embedded memory</u> such as is available from NDC Automation." (Instrument No. 309, at 32) (citing Instrument No. 309-1, at 17 ¶ 4:26-35). This, they contend further establishes that the memory key is physically connected to a device to exchange data. The Defendants point also to the prosecution history wherein the attorney who drafted the '819 patent specification, testified that a memory key is "like what we call a flash drive." *See* (Instrument No. 309-1, at 186 ¶ 129:2-3). This, too, the Defendants' contend, further supports their argument that the memory key must be "physically connected" to a device.

Plaintiff replies that Defendants are attempting to improperly add a limitation derived from one embodiment of the patent and import that limitation into the entirety of the claim. *See* (Instrument No. 315, at 11).

### b.

When construing claim language, context matters. *See Phillips*, 415 F.3d at 1316. In the specification, the memory key is consistently described as being physically connected to a device to facilitate the exchange of information. In relevant part, the specification teaches that: (a) an "operator inserts the memory key into an appropriate receptacle associated with the fuel pump identification. The memory key carries the operator identification and authorization code required for fuel delivery" *see* (Instrument No. 309-1, at 20 ¶ 10: 45-49) and (b) "the vehicle identification code is written to the memory key upon its insertion by the operator," *see* (Instrument No. 309-1, at 22 ¶ 13:18-20). The specification further explains that "use of a memory key as a customer identification and fuel delivery authorization could be employed with any of the other modules to permit the delivery of fluid." (Instrument No. 309-1, at 22 ¶ 14:45-49). Thus, the patent, when written in 1990, contemplated that any memory key associated with the modules would be physically connected to a device in order to exchange data. *See Phillips*, 415 F.3d at 1312-13 (ordinary and customary meaning to persons of skill in

47

A47

the art as of the effective date of the patent application). Accordingly, the Court adopts the Defendants' proposed construction.

### 2. Claim 38 and 39, Term No. 11: "ignition key"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Ignition key | The term does not require construction | A mechanical key used in a motor vehicle to turn the ignition switch of the vehicle |

#### a.

The eleventh disputed term is "ignition key" The term is featured in claim 39. *See* (Instrument No. 301-1, at 28 ¶ 4:57-61). According to the Plaintiff, the patentee has not acted as his own lexicographer by providing specialized definitions for the term "ignition key", thus the term should be construed according to is ordinary meaning. However, given that the plain meaning of the term is easily understood, the term does not require further construction. *See* (Instrument No. 301, at 20).

Defendants argue that "ignition key" means "a mechanical key used in a motor vehicle to turn the ignition switch of the vehicle." In the Defendants' view, the '819 patent provides no help in analyzing the meaning of "ignition key" as the patent is devoid of any reference to an "ignition key." Thus, they contend the court must discern what the meaning of "ignition key" would be to a person of ordinary skill in the art when the patent was filed in August 1990. *See* (Instrument No. 309, at 33).

Plaintiff replies that Defendants are attempting to improperly add a limitation—i.e. "mechanical key"—derived from one embodiment of the patent and import that limitation into the entirety of the claim. *See* (Instrument No. 315, at 11).

#### b.

The Court has determined that claim 39 is invalid. Accordingly, the court need not construe the language of the invalid claim.

**V.**

This court has construed the disputed terms as follows:

| Term No. | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|---|
| 1 | "fluid delivery transaction" | This term requires no construction. | a commercial exchange involving delivery of fluid | a commercial exchange involving delivery of fluid |
| 2 | "fluid container" | This term requires no construction. | a reservoir for storing fluid | a reservoir for storing fluid |
| 3 | "fluid delivery system" | This term requires no construction. | a system that transfers fluid from an external source to fluid containers | a system that transfers fluid from an external source to fluid containers |
| 4 | "personal identification means for generating an identification signal identifying the person" | **Function** – generating an identification signal identifying the person<br><br>**Structure** – a programmable read only memory device, a power receive coil, a signal transmitting coil, a phase shift key encoder and a modulator plus equivalents | **Function** – for generating a signal containing information that itself establishes the identity of the person requesting the fluid delivery transaction<br><br>**Structure** – a passive identification module that includes a memory that stores information that establishes the identity of the person | **Function** – for generating a signal containing information that itself establishes the identity of the person requesting the fluid delivery transaction<br><br>**Structure** – a passive identification module that includes a memory that stores information that establishes the identity of the person |

| Term No. | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|---|
| 5 | "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means" | **Function** – storing and retrieving information<br><br>**Structure** – a central processing unit, memory and a data bus plus equivalents | **Function** – for storing and retrieving information and capable of being operatively linked to the personal identification means<br><br>**Structure** – a fuel pump module of a service station, pump truck, or stationary tank that includes a central processing unit and a non-volatile memory | **Function** – storing and retrieving information<br><br>**Structure** – a central processing unit, memory and a data bus plus equivalents |
| 6 | "information communication means linking said fluid delivery system information means and said personal identification means" | **Function** – linking said fluid delivery system information means and said personal identification means<br><br>**Structure** – a coil capable of transmitting a signal and a coil capable of receiving a signal | **Function** – for the communication of information between the fluid delivery system information means and the personal identification means<br><br>**Structure** – a signal transmitting coil and a signal receiving coil | **Function** – for the communication of information between the fluid delivery system information means and the personal identification means<br><br>**Structure** – a coil capable of transmitting a signal and a coil capable of receiving a signal |

A50

| Term No. | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|---|
| 7 | "security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container" | **Function** – verifying said identification signal prior to the delivery of fluid to the fluid container<br><br>**Structure** – a signal receiving coil, a demodulator and a phase shift key decoder plus equivalents | **Function** – verifying said identification signal prior to the delivery of fluid to the fluid container<br><br>**Structure** – The specification does not disclose sufficient structure for performing the recited function and therefore claim 22 is invalid under 35 U.S.C.§ 112. | **Function**– verifying said identification signal prior to the delivery of fluid to the fluid container<br>**Structure** – a signal receiving coil, a demodulator and a phase shift key decoder plus equivalents |
| 8 | "for the transmission of operational energy for said personal identification means" | for the transmission of power to the personal identification means | for the transmission of power to the personal identification means which has no independent battery or other power source | for the transmission of power to the personal identification means which has no independent battery or other power source |
| 9 | "information regarding the fluid delivery transaction is stored" | This term requires no construction. | information relating to a commercial exchange involving delivery of fluid, such as price of fluid, type of fluid, date and quantity of delivery, that is memorialized for record keeping purposes | information relating to a commercial exchange involving delivery of fluid is stored |

51

| Term No. | Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|---|
| 10 | "memory key" | This term requires no construction. | a memory module that is physically connected to a device to exchange data. | a memory module that is physically connected to a device to exchange data. |
| 11 | "ignition key" | This term requires no construction. | a mechanical key used in a motor vehicle to turn the ignition switch of the vehicle | No construction necessary as the claim is invalid |

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the ___7th___ day of December, 2012, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**

Case: 13-1462 Case: 13-1462 Document: 47 Document: 46 Page: 91 Page: 91 Filed: 09/30/2013 Filed: 09/30/2013

Case 4:11-cv-00122   Document 372   Filed in TXSD on 05/22/13   Page 1 of 4
Case 4:11-cv-00122   Document 371-1   Filed in TXSD on 05/21/13   Page 1 of 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| RYDEX, LTD. | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO.: 4:11-CV-122 |
| | § | |
| v. | § | |
| | § | |
| FORD MOTOR COMPANY, *et al.*, | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendants. | § | |

### FINAL JUDGMENT

The Court having considered the parties' Joint Stipulation for Entry of Order Granting

Judgment of Non-Infringement hereby ORDERS the entry of final judgment as follows:

A.   Plaintiff has asserted claims 22 and 38-40 of the '819 patent against products of

Defendants (the "Accused Products") in this matter.

B.   Defendants' Accused Products do not infringe asserted claims 22 and 38-40, as

construed by the Court in its *Markman* Order, for the following reasons:[1]

1.   The Court construed the term "fluid delivery transaction" to mean "a

commercial exchange involving delivery of fluid." *See Markman* Order (Doc. No. 331)

at 22-24.   The Accused Products, however, do not include "a commercial exchange

involving delivery of fluid" because the starting of a vehicle does not relate to a

commercial exchange.   Therefore, based on the Court's construction of this term, Rydex

---

[1] The Court notes that Defendants contend they do not infringe for numerous other reasons not listed in their stipulation with Rydex and that Defendants have preserved all of their respective rights with regard to those positions.

Case: 13-1462 Case: 13-1462 PARTICIPANTS ONLY Document: 47 Page: 92 Filed: 09/30/2013

Case 4:11-cv-00122   Document 372   Filed in TXSD on 05/22/13   Page 2 of 4
Case 4:11-cv-00122   Document 371-1   Filed in TXSD on 05/21/13   Page 2 of 4

has stipulated that the Defendants' Accused Products do not meet the "fluid delivery transaction" limitation in Claim 22 and therefore do not infringe claims 22 and 38-40 of the '819 patent, as construed by the Court.

2.     The Court construed the term "fluid container" to mean "a reservoir for storing fluid." *See Markman* Order (Doc. No. 331) at 25-26. The Court also held that the term "fluid container" does not encompass "fuel lines." *See id.* at 19-20. The Accused Products' fuel lines, therefore, are not reservoirs for storing fluid, as construed by the Court. Therefore, based on the Court's claim construction, Rydex has stipulated that the Defendants' Accused Products do not meet the "fluid container" limitation in Claim 22 and therefore do not infringe claims 22 and 38-40 of the '819 patent, as construed by the Court.

3.     The Court construed the term "fluid delivery system" to mean "a system that transfers fluid from an external source to fluid containers," with the "external source" being external to the vehicle, rather than within a vehicle. *See Markman* Order (Doc. No. 331) at 26-28. The Accused Products, however, do not include a system that transfers fluid from an external source to the vehicle, rather than within a vehicle. Therefore, based on the Court's claim construction, Rydex has stipulated that the Defendants' Accused Products do not meet the "fluid delivery system" limitation in Claim 22 and therefore do not infringe claims 22 and 38-40 of the '819 patent, as construed by the Court.

4.     The Court construed the term "information regarding the fluid delivery transaction is stored" to mean "information relating to a commercial exchange involving delivery of fluid is stored." *See Markman* Order (Doc. No. 331) at 44-46. The Accused

Case: 13-1462 Case: 13-1462 Document: 47 Document: 46 Page: 93 Page: 93 Filed: 09/30/2013 Filed: 09/30/2013

Case 4:11-cv-00122   Document 372   Filed in TXSD on 05/22/13   Page 3 of 4
Case 4:11-cv-00122   Document 371-1   Filed in TXSD on 05/21/13   Page 3 of 4

Products, however, do not store information relating to a commercial exchange involving the delivery of fluid because the starting of a vehicle does not relate to a commercial exchange. Therefore, based on the Court's claim construction, Rydex has stipulated that the Defendants' Accused Products do not meet the "information regarding the fluid delivery transaction is stored" limitation in Claim 22 and therefore do not infringe claims 22 and 38-40 of the '819 patent, as construed by the Court.

      C.    In accordance with the Court's *Markman* Order, the Court finds that Defendants also cannot be liable for infringement of claims 39 and 40 because the Court has found them to be impermissibly broadened during reexamination proceedings and therefore invalid pursuant to 35 U.S.C. § 305. *See Markman* Order (Doc. No. 331) at 21.

      D.    Based on the foregoing facts and in light of the Court's *Markman* Order (which Rydex respectfully disputes), and subject to the parties' respective appellate rights, the Court finds that Defendants' Accused Products do not infringe claims 22 and 38-40 of the '819 patent as construed by the Court.

      E.    All of Defendants' counterclaims should be dismissed without prejudice as moot; however, such counterclaims may be reinstated by Defendants if the case is remanded to this Court for further proceedings. Plaintiff has reserved all rights with respect to Defendants' defenses and counterclaims. Defendants have reserved all rights with respect to any of Plaintiff's claims that remain on remand for further proceedings.

      F.    The parties shall have the same right of appeal they would have had in the event a final judgment of non-infringement had been entered following either a dispositive ruling by the Court or a jury verdict.

      G.    The Court finds no just reason for delay in entry of final judgment and directs

Case: 13-1462 Case: PARTICIPANTS ONLY Document: 46 Filed: 09/30/2013

Case 4:11-cv-00122   Document 372   Filed in TXSD on 05/22/13   Page 4 of 4
Case 4:11-cv-00122   Document 371-1   Filed in TXSD on 05/21/13   Page 4 of 4

entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b).

H.   Defendants have reserved the right to seek attorneys' fees and costs following entry of final judgment.   Plaintiff disputes that Defendants are entitled to recovery of any attorneys' fees.

IT IS SO ORDERED, ADJUDGED AND DECREED.

Signed May 22, 2013

United States District Judge
S DTX

US005204819A

# United States Patent [19]

## Ryan

[11] Patent Number: 5,204,819

[45] Date of Patent: Apr. 20, 1993

[54] **FLUID DELIVERY CONTROL APPARATUS**

[76] Inventor: **Michael C. Ryan,** 118 Center Ave., N., Mitchellville, Iowa 50169

[21] Appl. No.: **573,631**

[22] Filed: **Aug. 27, 1990**

[51] Int. Cl.$^5$ ...................... **G06F 15/20; G06F 7/04; H04B 5/02**

[52] U.S. Cl. .............................. **364/465; 340/825.35; 455/41; 902/5**

[58] Field of Search ............................. 235/381, 382; 340/310 A, 310 R, 825.34, 825.35; 364/465; 455/41; 902/5

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,742,150 | 6/1973 | Sherman et al. | 455/41 |
| 4,600,829 | 7/1986 | Walton | 235/439 |
| 4,837,556 | 6/1989 | Matsushita et al. | 340/310 A |
| 4,839,854 | 6/1989 | Sakami et al. | 364/900 |
| 5,070,535 | 12/1991 | Hochmair et al. | 128/420.6 X |

*Primary Examiner*—Edward R. Cosimano

*Attorney, Agent, or Firm*—Kent A. Herink; Brian J. Laurenzo

[57] **ABSTRACT**

Apparatus for communication of information from a passive identification module that may be associated with a fluid container and an active communication module associated with a fluid delivery device. The passive identification module has no independent battery or power source but receives its operational energy from an RF signal generated by the active communication module. Upon initiation of a fluid delivery transaction a communication link is established between the passive identification and active communication modules and will proceed only if appropriate authorization is received by the active communication module and an associated information storage and retrieval device. Information regarding the fuel delivery transaction may be stored on the storage and retrieval device and may be communicated to another local or remote device for further processing.

**22 Claims, 12 Drawing Sheets**





*FIG.1*



*FIG. 2*





Case: 13-1462 CASE PARTICIPANTS ONLY Document: 47 Page: 99 Filed: 09/30/2013

FIG. 4



FIG.5



*FIG. 6*



FIG. 7

Clock/ Calendar
556
LAN controller
550
RS485 driver and receiver
563
Local Area Network
DIP Switch
561
Buffer
24
544
64K bit Memory Key
559
Data Mem 32K bytes non-volatile
548
Programmable program (EEPROM) 32K bytes
547
Program Mem 32K bytes
546
558
alphanumeric display
529
coil driver
574
Fuel nozzle coil
28
amplifier
584
Modulator
572
Demodulator
586
570
WDT
534
CPU
Serial Data Port
Voltage Reg.
542
+5V
+12V DC
interface
527
keyboard
525
7 8 9
4 5 6
1 2 3
0
2K bit Memory Key
522
Buffer
Signal Cond
Signal Cond
Signal Cond
532
pump override lamp
559
pump I override sw.
557
horn
551
on board pump motor relay
553
fuel pulser
555



FIG. 8

keyboard
7 8 9
4 5 6
1 2 3
0
625
Interface
627
WDT
634
CPU
Serial Data Port
670
632
DIP switch
fuel type
661
alphanumeric display
629
17
658
Program Mem 32K bytes
646
Programmable program EEPROM 32K bytes
647
Data Mem 32K bytes non-volatile
648
64K bit Memory Key
659
Clock/ Calendar
656
644
UART
654
RS422
653
Remote Display
665
TX Coil Latch
660a
Modulator
672
RX Coil Latch
660b
coil driver
74
Hose 1 Coil
Hose 2 Coil
Hose 3 Coil
Hose 4 Coil
Diesel 1 Coil
Diesel 2 Coil
Truck Coil
76
amplifier
84
Demodulator
686
pump 1 override sw.
pump 2 override sw.
pump 1 override lamp
pump 2 override lamp
Buffer
Signal Cond
IGN
Odometer
Fuel Pulser
fuel valve 1
fuel valve 2
fuel valve 3
fuel valve 4
horn
Oil Dipstick removal sensor
Voltage Reg.
+5V
642
+12V DC
optional umbilical power cord
633
657a
657b
659a
659b
640
638
655a
655b
663a
663b
663c
663d
651
637



19
759
64K bit Memory Key
760
Coil Enable Latch
778
780
784b
coil driver
Fast Fuel coil
amplifier
Data Mem 32K bytes non-volatile
748
coil driver
Std. nozzle coil
amplifier
Clock/ Calendar
Programmable program (EEPROM) 32K bytes
747
774
776
784a
756
744
Program Mem 32K bytes
746
Modulator
772
786
Demodulator
770
734
WDT
CPU
Serial Data Port
732
727
Interface
725
keyboard
7 8 9
4 5 6
1 2 3
0
alphanumeric display
2K bit Memory Key
pump override switch
Buffer
Signal Cond
Buffer
Buffer
fuel type
761
742
+5V
Voltage Reg.
+12V DC
729
722
757
pump override lamp
759
fuel pulser
755
fuel valve
763a
standard nozzle
771
fuel valve
763b
fast fuel nozzle
773

FIG. 9



FIG.10
CPU
Serial Data Port
WDT
2K bit Memory Key
Buffer
buzzer on PC Board
RS485 driver and receiver
To other remote units and base
keyboard
keyboard interface
Program Mem 32K bytes
Data Mem 64K bytes non-volatile memory
64K bit Memory Key
UART
RS485 driver & receiver
to PC or modem
Clock/ Calendar
display driver
LC display
Voltage Reg.
+12V DC
+5V
7 8 9
4 5 6
1 2 3
0
822
834
832
864
895
870
825
827
846
848
854
852a
559,659,759
21
856
891
893
842

Case: 13-1462 Case: 1462  PARTICIPANTS ONLY  Document: 47  Page: 106  Filed: 09/30/2013 Filed: 09/30/2013



*FIG.11*



FIG.12

5,204,819

1

## FLUID DELIVERY CONTROL APPARATUS

### BACKGROUND OF THE INVENTION

The present invention relates generally to an apparatus for controlling the delivery of fluid to a container or reservoir and, more specifically, to an apparatus for the exchange of security, identification, and transaction information between a container, such as a fuel or other fluid storage tank, and a fluid delivery system.

The delivery and control of the delivery of fluids is ubiquitous, varying from water, such as for irrigation, liquefied petroleum gas (propane), oxygen and other gasses, and petroleum based fuels such as gasoline and diesel fuel. As a specific example, many vehicles are operated as a part of a commercial enterprise wherein detailed and accurate records are needed to account properly for the use of the vehicle and to support income tax return filings. Very often the vehicle is owned other than by the operator and fuel used by the vehicle is purchased by the absentee owner at the time a fuel delivery is made. Accurate and reliable records are necessary to assure that the appropriate vehicle receives the purchased fuel and, to the extent possible, that the miles logged by the vehicle correspond to actual commercial, not private, use.

### SUMMARY OF THE INVENTION

The present invention includes a first information storage and retrieval device usually associated with a fluid container and a second information storage and retrieval device associated with a fluid delivery system. The first information device contains identification information which typically identifies the fluid container, the type of fluid it is to hold, and so on, for security and billing purposes. The second information device contains information identifying the fluid delivery system, the price of fluid, quantity and type of fluid being delivered, time, date, and so on. A data communications link interconnects the first and second information devices during a fluid delivery transaction to permit the transmission of information from the first information device to the second information device which will record the transmitted information, permit fluid delivery if the container is authorized, and record other information regarding the fluid delivery transaction.

In a preferred embodiment, each of the information devices is connected to a data communication antenna for radio frequency communication from the first to the second information device. Information from the first information device is coded into a voltage signal that is sent through the data communication antenna. A corresponding voltage signal will be induced in the data communication antenna of the second information device and decoded and stored or processed. When the fluid delivery system is delivering, e.g., a petroleum-based fuel to a vehicle, usually via a fuel nozzle inserted into a fuel orifice of the vehicle, the data communication antennae are in transmitting and receiving proximity. The first information device has no independent battery or power source, but includes a power receiving antenna which receives energy transmitted from a power transmitting antenna of the second information device. This energy is used by the first information device to transmit its stored information via the data communications link.

A feature of the present invention is to provide a fluid delivery control system which is automatically activated when a fluid delivery nozzle is inserted into the corresponding input orifice of a fluid container.

Another feature of the present invention is positive identification of the fluid container for security and billing purposes to help prevent the delivery of fluid to unauthorized containers.

A further feature of the present invention is to permit automatic payment for delivered fluid without the use of an identification card or other like device.

Still another feature is the recordation of relevant information regarding the fluid delivery transaction for the generation of accurate and reliable reports.

Still a further feature permits the secure delivery of fluid from an unattended fluid delivery location.

Yet a further feature is a system for identifying either a fluid container or an authorized person which utilizes a passive identification module that has no independent power source but receives its operational energy from an RF signal generated by the fluid delivery device.

Still another feature is a system for authorizing and memorializing a fluid delivery transaction that can be wholly controlled by an absent purchaser of the fluid.

Still a further feature is an automatic disabling of the fluid delivery if the delivery nozzle is removed from the corresponding input orifice of the authorized container.

Yet another feature is to provide a fluid delivery control and data exchange system that can be safely used in close proximity to inflammable fluids.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagrammatical view of a vehicle and two trailers on which a preferred embodiment of the invention has been installed and including a schematic block diagram of the exchange of information between portions of the invention;

FIG. 2 is a schematic block diagram of a truck tractor vehicle identification module portion of the apparatus of the present invention associated with the vehicle;

FIG. 3 is a schematic block diagram of a truck trailer identification module portion of the apparatus of the present invention;

FIG. 4 is a schematic block diagram of an automobile identification module portion of the apparatus of the present invention;

FIG. 5 is a schematic block diagram of a mobile equipment identification module portion of the apparatus of the present invention;

FIG. 6 is a schematic block diagram of a nonmobile equipment identification module portion of the apparatus of the present invention;

FIG. 7 is a schematic block diagram of a fuel pump module portion of the apparatus of the present invention;

FIG. 8 is a schematic block diagram of a fuel pump truck module portion of the apparatus of the present invention;

FIG. 9 is a schematic block diagram of a stationary fuel tank module portion of the apparatus of the present invention;

FIG. 10 is a schematic block diagram of a memory key reader module portion of the apparatus of the present invention;

FIG. 11 is a schematic block diagram of a passive identifier module that is associated with a fluid container; and

A131

3

FIG. 12 is a schematic block diagram of an electrical circuit that is added to the fluid delivery modules of FIGS. 7–9 for use with the passive identifier module.

## DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

A diagrammatical view of the present invention is illustrated in FIG. 1, particularly, a preferred embodiment wherein a vehicle identification module 10 is located on board a truck tractor 12 to which is attached a first trailer vehicle 14 and a second trailer vehicle 16. During the course of operation of the truck tractor 12 and associated trailers 14 and 16, it is desirable to collect, store and transmit a variety of data regarding the vehicle. Examples of such data include hours of engine operation, miles traveled, fuel consumed, fuel cost, dates and times of engine operation, dates and times of fueling operations, manifest information regarding the cargo carried in the vehicles, operator information, and the like. It is also desirable to control refueling operations so that fuel delivered to the vehicle is properly recorded and charged, to prevent theft of fuel, and to provide an easy and convenient method for recording and communicating such information to a central processing location.

In summary, information is collected by sensors located on the truck tractor 12 and associated trailers 14 and 16, or via direct communication from outside devices, and is stored on identification modules. The vehicle identification module 10 is located on the truck tractor 12 and acts as a central collection point. A first trailer identification module 18 is located on the first trailer 14 and a second trailer identification module 20 is located on the second trailer 16. The trailer identification modules 18 and 20 are in communication with the vehicle identification module 10. Information and data collected on the trailer identification modules 18 and 20 may either be communicated at once to the vehicle identification module or may be stored for later communication.

In operation, an operator will enter the truck tractor 12 and will insert an operator identification module 22 into the truck tractor identification module 10. The operator's name, drivers license number, credit information and usage authorization code will be transmitted from the operator identification module 22 to the vehicle identification module 10. If the authorization code is correctly identified by the vehicle identification module as an authorized code, the operator will be allowed to start the engine and drive the truck tractor 12. During operation of the truck tractor 12, the vehicle identification module will collect and record the date and time when the engine was started, miles driven by the truck tractor 12, hours of operation of the engine, and other information as will be described in further detail below.

As described above, a trailer identification module 18 is located on board the first trailer 14. The first trailer identification module 18 has recorded on it a trailer identification number and the accumulated mileage that the first trailer 14 has been pulled by a tractor. Upon connection of the truck tractor 12 to the first trailer 14, a radio frequency (RF) communication link is established between the vehicle identification module 10 and the trailer identification module 18. The vehicle identification module 10 reads from the trailer identification module 18 the trailer identification number and accumulated mileage total. Additionally, the vehicle identification module 10 authorizes the release of the air brakes

4

of the trailer 14, as will be described in further detail below, to allow the trailer 14 to be towed behind the truck tractor 12. As the trailer 14 is towed, the distance traveled is communicated from the vehicle identification module to the trailer identification module 14 where it is used to increment the accumulated mileage. Upon disconnect of the truck tractor 12 from the first trailer 14, the accumulated mileage is written to nonvolatile memory on the trailer identification module 18 where it will be retained until the trailer 14 is again connected to a truck tractor that is equipped with the appropriate apparatus of the present invention.

The second trailer identification module 20 is located on board the second trailer 16 and functions identically to that of the first trailer identification module 18 upon its connection to the truck tractor 12 behind the first trailer 14. The trailer identification numbers, elapsed mileage on the trailers 14 and 16, and other information may be stored at the vehicle identification module 10 for bookkeeping and data collection purposes as will be described below.

The nonvolatile memory of the trailer identification modules 18 and 20 can also be used to store manifest information regarding the contents of the trailer, either when such contents are loaded or from the vehicle identification module 10. Such manifest information, as well as other information stored in the non-volatile memory of the trailer identification modules 18 and 20, can be communicated to the vehicle identification module 10, to a remote device via a communication link, and/or to a portable storage device such as a memory key available from Datakey Corporation, Burnsville, Minn., or a passive transponder with embedded memory such as is available from NDC Automation, Inc., 3101 Latrobe Drive, Charlotte, N.C., or as described below with respect to FIGS. 11 and 12.

A refueling operation will now be described. In the most common situation, the truck tractor 12 will drive up to a fuel delivery location such as a fuel service station. In a preferred embodiment of the invention, a fuel pump module 24 (FIG. 1) is located at the pump which is used to deliver fuel to the truck tractor 12. The fuel pump location includes the usual fuel nozzle which is inserted into a filler neck of a fuel tank of the truck tractor 12. Associated with the filler neck of the truck tractor 12 is an inductive coil 26 (FIG. 2). A similar fuel nozzle coil 28 (FIG. 7) is associated with the fuel nozzle of the fuel pump. The fuel tank coil 26 is in communication with the vehicle identification module 10 and the fuel nozzle coil 27 is in communication with the fuel pump module 24. Voltage signals present in either coil will be transmitted to and received by the other coil when they are in communicating proximity. In this manner, the vehicle identification module 10 and the fuel pump module 24 can intercommunicate during a fuel delivery operation.

Upon insertion of the fuel nozzle into the filler neck of the truck tractor 12, the fuel pump module 24 sends an inquiry signal to the vehicle identification module 10. In response to the inquiry signal, the vehicle identification module 10 transmits an authorization code to the fuel pump module 24 together with the vehicle identification number of the truck tractor 12, the time, date, odometer and engine hour readings, the operator's name and license number, and the trailer identification numbers and odometer readings of the two trailers 14 and 16. If the authorization code is correct, the fuel pump module 24 will activate the fuel pump to permit

5,204,819

5

the delivery of fuel to the fuel tank of the truck tractor 12. The cost of the fuel being delivered, the fuel type, the volume of fuel, the fuel pump identification code, and the station identification number are all transmitted from the fuel pump module 24 to the vehicle identification module 10. At short intervals during the fuel delivery operation, the fuel pump module 24 continues to inquire for the authorization code from the vehicle identification module 10. If the appropriate authorization code is not received, the fuel pump module 24 will turn off the fuel pump and in this way prevent delivery of fuel to an unauthorized vehicle or fuel tank.

Information collected by the fuel pump module 24 may either be stored for subsequent collection and processing or may be transmitted to a remote location. Such information may also be stored on the vehicle identification module 10. For example, the fuel pump module 24 may be directly connected to a station computer or pump controller 30 (FIG. 1) which will subsequently transmit the information, e.g., over telephone lines, to the owner of the truck tractor 12 and, in certain circumstances, to the appropriate financial institution for payment to the fuel pump owner for the fuel delivery made to the truck tractor 12.

A schematic diagram of the vehicle identification module 10 is illustrated in FIG. 2. Principle control of the vehicle identification module 10 is accomplished by a central processing unit 32 to which is attached a watch dog timer 34. Information or data from the operator identification module or memory key 22 is communicated both to the CPU 32 and to a 2K bit nonvolatile memory storage device 36 where it will be stored for access by the CPU. Odometer and engine hour information is communicated to the CPU from transponders 38 and 40, respectively.

Power voltage is supplied to the CPU through a 5-volt output voltage regulator 42 connected to the 12 volt electrical system of the truck tractor 12. Instruction coding or programs for the operation of the CPU 32 are stored on a 32K byte memory device 46 and a 2K byte data memory device 48 is provided for the storage of data collected and processed by the vehicle identification module 10. A 32K byte programmable memory device (EEPROM) 47 serves as a means for modifying or updating the program for controlling the operation of the vehicle identification module 10. If the program originally stored on the 32K byte RAM device 46 is to be changed, a new program can be stored on the EEPROM 47 via an appropriate communication link (including the inductive coils described below). The new program will include the instructions necessary to effectively debilitate the original program stored on the RAM device 46. In this way, the program can be changed, altered, or updated as desired and from a remote location without substitution of a memory chip or device. A local area network (LAN) controller 50 handles the communication of data and instructions between various elements of the vehicle identification module 10.

Communication between the vehicle identification module 10 and an on board computer 23 is accomplished through an RS485 communication link 52 which is connected to an SAE bus of the on-board computer system. The RS485 communication link 52 communicates with a UART 54 which in turn communicates with a clock calendar 56. The memory devices 46 and 48, the LAN controller 50 and the clock calendar 56 are all connected to the central processing unit 32

6

by way of a communication bus 58. Also connected to the communication bus 58 is a latch 60 which is used to operate the several input and output devices as will be described in further detail below. Additionally, the LAN controller 50 can communicate with a data collection device sold by Xata Corporation, Burnsville, Minn., via a second RS485 communication link 62.

An alarm relay 64 is connected to the CPU 32 and operated thereby to sound an alarm (not shown) if an alarm condition is sensed by the central processing unit 32.

A pair of fuel cap sensors 66 and 68 are connected to the central processing unit 32 to send a signal when the corresponding fuel cap has been removed to permit access to a fuel tank of the truck tractor 12.

An oil dipstick removal sensor 41 is connected to the CPU 32 to record the date, time, and operator identification on the vehicle identification module 10 of each time the oil dipstick of the truck tractor 12 is removed during the monitoring of the oil level.

The vehicle identification module 10 is connected to four antennae in the preferred embodiment. A fuel tank coil 26 is associated with one of the fuel tanks of the truck tractor 12 and a second fuel tank coil 76 is associated with the second fuel tank. A third coil, the trailer coil 80, is mounted at the rear of the truck tractor 12 for communication with the trailer 14 as described above. The vehicle identification module 10 includes an appropriate receptacle for a 2K bit memory key 22 from which is downloaded the operator identification code and company authorization code. A 2K bit nonvolatile memory device 36 contains the identification code of the vehicle identification module 10 and the fuel type required by the truck tractor 12.

As described above, the fuel tank coil 26 is positioned around the filler neck of a fuel tank of the truck tractor 12. Voltage signals from a serial data port 70 of the central processing unit 32 are communicated to the fuel tank coil 26 through a modulator 72 and a coil driver 74. A signal present at the coil driver 74 will be communicated to the fuel tank coil 26 if the latch 60 has provided the appropriate enable signal to the coil driver 74. A second fuel tank coil 76 is provided which is driven by a second coil driver 78. Communication between the truck tractor 12 and the trailer 14 may be accomplished by a trailer coil 80 and a corresponding coil driver 82 as will be described in more detail below. An oil filler neck coil 81 is provided around the engine oil filler neck of the engine which is driven by a coil driver 83. Of course, the coil drivers 78, 82, and 83 are also enabled by signals from the latch 60.

The coils 26, 76, 80, and 81 can also function as receivers. Voltage signals induced in the coils 26, 76, 80, and 81 are amplified in an amplifier 84(a)–(d) and are communicated to the serial data port 70 of the central processing unit 32 through demodulator 86 provided the appropriate enable signal has been received by the amplifier 84(a)–(d) from the latch 60.

In the preferred embodiment, the fuel tank coils 26 and 76 are made of 13 six-inch diameter turns of 26 gauge copper wire that are embedded in a silastic rubber potting material surrounded by a polyethylene cover. A 0.1 micro farad capacitor is connected across the lead wires of the coil. Together the capacitor and inductance of the coil create a tuned circuit resonant at approximately 61 kilohertz. The drive signal is at approximately five volts, peak-to-peak and a frequency of 60 kilohertz for a binary one. The fuel nozzle coil 28 is

5,204,819

7

similarly constructed so that the coils 28 and 26 or 76 are matched for efficient intercommunication. In tests, the coils 28 and 26 of 76 described above have a read-write distance of approximately eighteen inches. In other circumstances where the read-write distance must be greater, for example if the intercommunication coils are mounted on facing surfaces of the truck tractor and an adjacent trailer, a larger diameter coil can be constructed and will function at the above frequencies provided the inductance of the coil remains substantially the same. A pair of fourteen-inch diameter coils have a read-write distance of approximately six feet.

If an on board computer 23, for example, a computer manufactured by Xata Corporation, the vehicle identification module will function essentially as a communication link between the fuel pump identification module 24 and the on board computer 23. If no on board computer system is present, transponders transmit odometer and engine hour information to the central processing unit 32 of the vehicle identification module 10.

A schematic diagram of the trailer identification modules 18 and 20 are illustrated in FIG. 3. Many of the principle elements of the trailer identification modules 18 and 20 are identical to that of the vehicle identification module 10 and are denoted with 100 series numbers corresponding to the numbers assigned to corresponding elements of the vehicle identification module 10. Also attached to the data bus 158 is a 64K bit memory key device 159 which can be used to transmit up to 64K bits of information from the memory key device 159 to 30 the trailer identification module 18 or 20 or which can store up to 64K bits of information from the trailer identification module 18 or 20. The trailer identification module 18 or 20 monitors the condition of a pair of doors of the trailer 14 or 16, respectively, by way of door open sensors 111 and 113 which are connected to the central processing unit 132. A plurality of other sensor or transponder units such as the temperature sensors 115a–c, humidity sensors 117a–c and a proximity sensor 119, are used to monitor the temperature and humidity inside the trailer 14 and, with respect to the proximity sensor 119, the proximity of the rear of the trailer 14 to an unloading device or location. The sensors 115, 117, and 119 are analog sensors which produce voltage signals corresponding to the conditions they are sensing. The analog signals are conditioned and sent to an 8-channel multiplexor and analog digital convertor 121 which provides an interface between the central processing unit 132 and the sensors so that information collected by the sensors can be stored or processed by the central processing unit 132. Additional sensors or transponders could be used for sensing engine operating parameters of the reefer power unit, for example. In the event greater than eight sensors or transponders are used additional multiplexor channels can be added.

A motor driven valve 123 for the control of the air brakes of the trailer 14 is illustrated at 123. If no signal is received from the central processing unit 132, the motor drive value 123 will remain closed and thus prevent the air brakes from releasing. The brakes of the trailer 14 will thus be applied and prevent the trailer 14 from being moved by a tractor unit. Only if a signal is received from the CPU 132 will the motor driven value 123 open to permit release of the air brakes and movement of the trailer 14. At unhook of the trailer 14 from the tractor 12, the motor driven valve 123 must be driven closed by the operator while a safety button is held closed. Once driven closed, the motor driven valve

8

123 can only be released if it receives the proper authorization code from the vehicle identification module 10.

An automotive module 11 that is similar in construction and operation as the vehicle module 12 is illustrated schematically in FIG. 4 with 200 series figure numbers used to identify elements of the automotive module 11 that correspond to elements of the vehicle identification module 10 and trailer identification module 18. An oil dipstick removal sensor 237 has been added to record the time and date of removal of the oil dipstick, presumably to check the engine oil level. Additionally, a keyboard 225 and interface 227 are provided for the manual input of information to the central processing unit 232. An alphanumeric display 229 is also provided to display information being input from the keyboard 225 and information coming from the central processing unit 232.

It may be desired to use the present invention to monitor the use and operation of the vehicles other than a truck tractor and trailer. For example, an identification module similar to the vehicle identification module 10 and vehicle identification module 11 may be provided on mobile equipment such as a tractor, road grader, dump truck, or any other piece of mobile equipment. A mobile equipment identification module 13 is illustrated schematically in FIG. 5 with 300 series numbers identifying elements of the mobile equipment identification module 13 that correspond to elements of the identification modules 10 and 11.

The vehicle identification module 10 thus functions as an information storage and retrieval device for operating and environmental conditions of the trailers as well as manifest information regarding cargo carried in the trailers. This capability of the vehicle identification module 10 is of particular utility for storing other information unrelated to a fuel delivery transaction. For example, service operations performed on the vehicle can be stored on the vehicle identification module to provide an accumulated service history of the vehicle that is carried with the vehicle itself. In another application, a device similar to the trailer identification module 18 or 20 could be associated with an underground storage tank. Senors or transponders for detecting the presence of leaking fuel from the underground storage tank would be connected to the CPU 132 in the same manner as the senors 115–119 shown in FIG. 3. The underground storage tank module would thus function as an automatic leakage monitoring system in addition to its two-way fuel delivery transaction identification and storage and network capabilities.

In addition, a 4-channel multiplexor and analog digital convertor 331 is provided for the purpose of permitting the storage and processing of information from transponders or sensors as may be appropriate for the particular piece of mobile equipment to which the identification module 13 is attached. In other respects, the mobile equipment identification module 13 will function similarly to the identification modules 10 and 11 described above.

The invention can also be adapted to function with equipment which use petroleum fuel or other fluids but are not necessarily mobile or used on a frequent or continuous basis. In such circumstances, it is desirable to have an identification module which is of low power consumption so that it can be battery operated over a reasonable lifetime. A schematic diagram of a low-power identification module 15 is illustrated in FIG. 6 with 400 series numbers identifying elements that corre-

5,204,819

9

spond to elements of the other identification modules. The central processing unit is a low power CPU **432** with read only program memory and a serial data port **470**. It is interconnected with a non-volatile RAM memory device **441** to which is written identification and authorization information at the time of manufacture. In a manner similar to the other identification modules, the low-power identification module can transmit information from the CPU **432** via a fuel tank coil **426** by way of a modulator **472** and coil driver **474**. To conserve power, the central processing unit **432** is turned on only when a threshold detector **443** senses that a fuel nozzle has been inserted into the filler neck of the equipment to which the low power identification module **15** has been attached. The threshold detector **443** activates a voltage switch **445** which then supplies power from a lithium battery **447** to the CPU **432**.

A schematic diagram of the gas pump module **24** is illustrated in FIG. 7, with 500 series numbers identifying elements corresponding to the elements of the other identification modules. As described above, the fuel pump module **24** controls the delivery of fuel from a fuel pump to a vehicle and receives, transmits, and records information regarding the fuel delivery operation and the operating history of the vehicle. Also included in the fuel pump module **24** are a plurality of signal input and output devices. A horn **551** is provided which can be activated by the central processing unit **532** as an alarm device. A fuel pump motor **553** of the fuel pump is controlled by a signal from the central processing unit **532** to permit delivery of fuel only to an authorized vehicle as will be described in more detail below. A pulse from the fuel pump motor corresponding to the volume of fuel being delivered is received in the generated by a fuel pulser **555** and CPU **532** for recording of the amount of the fuel delivery. Finally, an override system is provided consisting of an override switch **557** and a pump override lamp **559** to permit the delivery of fuel to an authorized vehicle that is not equipped with one of the vehicle identification modules described above. The required authorization code is input from a 2K bit memory key.

A DIP switch **561** can be selectively encoded to identify the individual fuel pump on which the fuel pump module **24** is located as well as the fuel type that is delivered by the fuel pump. It is interconnected to the CPU **532** by way of the data bus **558**. Additionally, intercommunication between a central computer and the fuel pump module **24** is provided by an RS485 driver and receiver **563** through the LAN controller **550** and data bus **558**.

As an alternative, information and data collected by the gas pump module **24** can be stored over a period of time and then transferred to the 64k bit memory key **559**. Data and information stored on the memory key **559** can subsequently be transferred or downloaded for further processing by a memory key reader module **21** as will be described in more detail below.

As an alternative to a stationary fuel pump location, fuel may be delivered to vehicles by a mobile pump truck. Included in the invention is a pump truck module **17** which is illustrated schematically in FIG. 8, with 600 series numbers identifying elements corresponding to similar elements of the other identification modules described previously.

The pump truck module **17** differs in that seven transmit and receive coils **76** are provided, four of which are associated with delivery hoses, two of which are associ-

10

ated with input filler necks for the tanks of the pump truck, and one of which is associated with the filler neck of the fuel tank of the pump truck itself. Each coil **76** has an associated coil driver **74** and output amplifier **84**. A transmit coil latch **660**a sends enable signals from the CPU **632** to the coil driver **74**. Correspondingly, a receiving coil latch **660**b enables the amplifiers **84**.

A DIP switch **661** is used to input the fuel type into the central processing unit **632**. A variety of input and output signals communicate information between the central processing unit **632** and remote sensors and equipment. Included are a pair of pump override switches **657**a and **657**b and associated pump override lamps **659**a and **659**b which will permit the delivery of fuel to authorized vehicles which do not have an appropriate identification module of this invention, as will be described in greater detail below. Also included are a pair of fuel pulsers **655**a and **655**b which provide pulses to the CPU **632** corresponding to the volume of fuel being delivered. A fuel valve **663**(a)–(d) is associated with each of the four hoses for the delivery of fuel from the pump truck. The fuel valves **663**(a)–(d) will be opened by the central processing unit **632**.

Illustrated schematically in FIG. 9 is a stationary tank module **19**, with 700 series numbers identifying elements corresponding to the elements of the other identification modules described previously. Unique to the stationary tank module **19** are a pair of distinct fuel delivery systems, one of which is at the standard volume rate via the standard nozzle **771** and the other of which is a fast fuel delivery nozzle **773** for the delivery of fuel at an increased volume rate for the filling of pump trucks and the like. Because the stationary tank module **19** may be at a remote location without ready access to an outside power source, it is anticipated that power be supplied from either a lithium battery, a solar battery recharge system, an umbilical power cord **633** (FIG. 8) between a pump truck and the stationary tank module **19**, or if available by a direct link to 110 volts AC or 12 volts DC.

A fuel delivery operation between a truck tractor which carries a vehicle identification module **10** and a fuel pump location having a fuel pump identification module **24** begins when the truck tractor **12** pulls into a fuel delivery location. The operator inserts the memory key **22** into an appropriate receptacle associated with the fuel pump identification module **24**. The memory key **22** carries the operator identification and authorization code required for fuel delivery, and will serve as a portable memory module on which the fuel delivery operation or a plurality of fuel delivery operations can be recorded.

The operator will remove the fuel cap from the fuel tank of the truck tractor **12**. Upon its removal, the time and date of the same will be recorded on the vehicle identification module **10**. The operator will then insert the fuel nozzle of the fuel pump into the filler neck of the fuel tank. When the fuel nozzle coil **28** is in communicating proximity to the fuel tank coil **26**, the fuel tank coil **26** will receive an inquire signal from the fuel nozzle coil **28**. Upon receipt of the inquire signal, the vehicle identification module **10** will transmit its authorization code and fuel type code. If the authorization code is recognized by the fuel pump module **24**, the delivery of fuel will begin. The vehicle identification module **10** will also transmit the driver's license and state code number, the license number and state code of the truck tractor **12**, the truck tractor **12** engine hours and odome-

A135

5,204,819

11

ter reading, the license number and state code of any trailers **14** and/or **16**, and the odometer readings of the trailers.

During the fuel delivery operation, the fuel pump identification module **24** continues to require an authorization code from the vehicle identification module **10**. If no authorization code is received, the fuel delivery will be discontinued. In the preferred embodiment, an inquire signal is transmitted at every one second interval. Accordingly, if the fuel nozzle is withdrawn from the filler neck of an authorized vehicle, the delivery of fuel will be promptly interrupted.

The fuel pump is equipped with a pulser which sends a signal that corresponds to a preselected volume of delivered fuel, e.g., a pulse for every one-tenth of a gallon. In this way, the fuel pump identification module **24** can keep track of the volume of fuel delivered to an authorized vehicle. This information is transmitted to and stored by the vehicle identification module **10**.

The fuel pump identification module **24** can also request and receive complete diagnostic engine data from a S.A.E. J1708 network bus of the truck tractor **12** if it is so equipped. The fuel pump identification module **24** may also be provided with a keyboard which can be used to input information directly to the fuel pump **24** identification module **24**. The keyboard can be used, for example, if fuel is to be delivered to a truck tractor that is not equipped with a vehicle identification module **10**. In this mode, an authorization code would be input into the keyboard by the operator. Another override function is provided by the 2K memory key **522** that must be inserted by the operator into the appropriate module of the fuel pump identification module. The memory key **522** identifies the operator and provides the appropriate authorization code which will permit a fuel delivery operation to proceed in an override condition.

Information and data received by the fuel pump identification module **24** may be transmitted to a remote location such as a main frame company computer via telephone lines in the usual method or via cellular telephone intercommunication. Alternatively, a local personal computer or similar computing device may be located at the service station of the fuel pump and which is in communication with each fuel pump identification module **24** at the service station location. A hard copy of the fuel delivery transaction is printed by the personal computer and may be stored by the owner of the service station, with a copy going to the truck tractor operator and to the owner of the truck tractor. If the fuel pump identification module is connected so as to transmit information to a remote computer, the invention can be used to provide automatic data capture to allow for electronic funds transfer or ACH payment of fuel purchases and to permit generation of accounts receivable, inventory, fleet management, stocks depletion, and excise tax accounting reports of interest to the owner of the truck tractor and of the service station.

Information and data may be exchanged between the vehicle identification module and the trailer identification module either by way of a hard-wired RS232 or RS485 communication link or by intercommunicating coils similar to the fuel tank and fuel nozzle coils described above. The advantage of the intercommunicating coils is that no independent, hard-wired connection is required, so that the connection is not subject to degradation under the severe environmental and use conditions experienced by over-the-road trucks. A truck tractor coil is mounted on the rear of the truck tractor

12

so that it will be in communicating proximity to a trailer coil that will be mounted on the front end portion of the trailer **14**. Alternatively, the tractor coil could be mounted under the fifth-wheel hub and above the frame of the tractor; the trailer coil would then be mounted on the trailer floor so that it will be above the tractor coil when the trailer is connected to the fifth wheel. Or, the tractor coil is embedded in the casting of the fifth-wheel hub and the trailer coil in the fifth-wheel plate of the trailer. Information collected by the trailer identification module **18** can thus be communicated to the vehicle identification module **10** and, conversely, odometer and time and date information can be transmitted from the vehicle identification module **10** to the trailer identification module **18**. A similar set of coils are provided between the first trailer **14** and the second trailer **16** so that intercommunication between the vehicle identification module **10** and the second trailer identification module **20** can occur.

The fuel pump identification module **24** is also provided with a DIP switch **561** which can be used to set an identification code for the fuel pump identification module **24**. Further, the module **24** accepts a 64K bit memory key **559** to which may be written fueling data that has been stored at the fuel pump identification module **24**, which is necessary if the fuel pump identification module **24** is not linked for communication to a remote data capture unit as described above.

At hook up of the truck tractor **12** and the trailer **14**, an authorization code is transmitted from the truck tractor **12** to the trailer **14** through the coils **80** and **126**. If the trailer identification module **18** recognizes the authorization code, it will respond with its resident identification code and totalized mileage. This information is stored at the vehicle identification module **10**. If manifest information has been stored at the trailer identification module **18**, it will also be transmitted for storage at the vehicle identification module upon hookup.

If the trailer **18** is a refrigerated trailer, or "reefer" the vehicle identification module will request a systems check of the conditions, for example temperature and humidity, inside the refrigerated trailer. Such information is available on the trailer identification module from its sensors **115** and **117**. Additionally, whether the doors are open on the refrigerated trailer could be monitored as well as fuel level in the engine which powers the refrigeration unit of the refrigerated trailer.

The trailer identification module **18** is connected to the electrical system of the truck tractor **12**. When the trailer **14** is unhooked from the truck tractor **12**, the trailer identification module **14** senses the loss of power and built in capacitors provide the power to write data to nonvolatile memory of the trailer identification module **18** for storage. In this way, total accumulated mileage of the trailer **14** is always available from the trailer identification module **18** even though it may not be always powered.

If the trailer **14** is a refrigerated trailer, power will be available from the refrigerated unit.

An information and power input module is located at the rear of the trailer **14** and communicates with the trailer identification module **18**. Information regarding the manifest or cargo to be carried by the trailer **14** can be input via this communication linkage which is connected to the RS485 driver **152** of the trailer identification module **18**.

A theft prevention function is built in to the trailer identification module **18**. If, at the time of hookup, the

5,204,819

13

trailer identification module 18 receives an appropriate company authorization code, the motor driven valve 123 is opened and the air line is opened to the air brakes of the trailer 14. When the truck tractor 12 is unhooked from the trailer 14, the operator will hold a switch down and manually drive the solenoid to the closed position to put the trailer in a "safe" condition.

The automotive identification module 11 (FIG. 4) functions very similarly to the vehicle identification module 10, and as explained above, has similar components. A 2K memory key 222 is inserted by an operator into an appropriate receptacle of the automotive identification module 11. The automotive identification module records the operator's identification number and authorization code and records on the memory key 222 the time and date every time that the automobile engine is started and stopped along with a chart of accounts and a business or personal mileage designation. Additionally, the vehicle identification code is written to the memory key 222 upon its insertion by the operator.

A 64K memory key 259 is used with the automotive identification module 11 to act as a portable random access memory device for data and information storage and downloading of such information which is written to the key by the automotive identification module 11. Inputs from the odometer 240 and ignition transponders 238 are written to the memory key 259 when the vehicle is started and stopped so as to provide a corresponding log of miles and engine hours along with the clock time of starting and stopping of the automobile. An optional keyboard 225 can be used to provide a means for inputting a chart of accounts and for selecting a credit card identification code which is stored in the memory of the automobile identification module 11 to provide authorization for payment of fuel via the stored credit card information. This credit card information can be accessed only through the inductive link between the coils of the fuel nozzle and the fuel filler neck. While the automobile identification module 11 is primarily powered by power from the battery of the automobile, a lithium battery 244 is provided for backup power for the clock/calendar module 256.

An additional application of the invention is the mobile construction equipment identification module 13 (FIG. 5). As with the automobile identification module 11, a 2K bit memory key 322 or a 64K bit memory key (not shown) may be used to input the company authorization code for fueling, the operator identification code and other such information for downloading to the mobile construction equipment identification module 13. All other features remain substantially unchanged. An additional capacity is provided by the four channel multiplexor and analog to digital convertor 331 which permits four transponders to be connected to the central processing unit 332 for monitoring of operating conditions of the construction equipment on which the identification module 13 is mounted. For example, engine oil level could be monitored and connected to an alarm, and so on.

The module 13 has particular applicability in the airline industry wherein the fuel filler necks of the airplane tanks are equipped with coils 326 and fuel is delivered either from a stationary tank equipped with a module 24 or a pump truck having a module 17 as described below. The modules would communicate and interact to ensure that only the proper type of fuel was delivered, to automatically record on the airplane and at the fuel delivery device the type of fuel delivered, the date

14

and time, quantity, operator identification, and other useful information.

The invention also contemplates a low power identification module 15 (FIG. 6) for use on equipment which does not include a battery or other power means. The low power identification module 15 has recorded in nonvolatile RAM 441 a company, vehicle, and fuel type code. This code is recognized by fuel pumps that are owned by the owner of the equipment on which the low power identification module 15 is mounted. The low power identification module 15 remains inert until a threshold detector 443 is breached after which power is provided from the lithium battery 447 through the voltage switch 445 to the central processing unit 432.

The invention further contemplates that fuel may be delivered from a mobile pump truck to which is attached a pump truck identification module 17 (FIG. 8). The pump truck identification module 17 is adapted to accommodate a plurality of fuel delivery tanks, which in the preferred embodiment number four. Additionally, a coil is provided around the filler neck of the tanks to record fuel that is input into the pump truck. The pump truck identification module 17 is also adapted to provide for the delivery of fuel from each of the four separate tanks by way of the fuel valve 663. Fueling data captured by the pump truck identification module 17 includes the name of the authorized operator, the date, time, pump truck identification code, engine hours, odometer reading, the identification code of the mobile equipment to which fuel is being delivered, the operator I.D. of the mobile equipment, the odometer, engine hours, fuel type, and number of gallons delivered to the mobile equipment. As with the fuel pump identification module 24, continuity of signal is required for security purposes such that the delivery of fuel is interrupted if the fuel nozzle is removed from the filler neck of an authorized vehicle or piece of mobile equipment.

Fueling may also be done in an override condition, wherein the data captured includes the name of the authorized operator of the pump truck, the date, time, pump truck I.D. number, engine hours, odometer, fuel type, and number of gallons delivered. The system may be overridden only when an authorized memory key is inserted and the operator engages an override switch.

Of course, use of a memory key as a customer identification and fuel delivery authorization device could be employed with any of the other modules to permit the delivery of fuel from a tank equipped with a module to a non-equipped vehicle or tank.

A reel-mounted hose is frequently used for the dispensing of fuel from the pump trucks. This fuel nozzle may also be used to communicate data and information with a vehicle or piece of mobile equipment. For this communication, a coil is located on the hub of the hose reel and a corresponding stationary coil is located adjacent thereto and mounted on the pump truck. In this way, communication proximity is maintained regardless of the rotational position of the hose reel.

The controls and fuel nozzles and hoses of a fuel pump truck are typically located at the rear of the truck. To provide information to the operator during a fuel delivery operation, the amount of fuel being delivered and, possibly, the type of fuel, time and date, and customer identification information, is displayed on a remote display 665 located at the rear of the pump truck. The remote display 655 is connected to the bus 658 by a UART 654 and an RS422 communication driver 653. A printer (not shown) may be located on the pump

5,204,819

15

truck for the generation of invoices and the like so that a hard copy of the fuel delivery transaction can be left with the customer.

The invention also contemplates a stationary fuel tank identification module **19** (FIG. 9) of similar structure and function as the identification modules described above. The stationary fuel tank identification module **19** may be powered either by battery, solar and battery, a direct power link (either 110 volts AC or 12 volts DC) or an umbilical cord **633** (FIG. 8) from a pump truck. The identification module **19** controls a pair of solenoid valves, standard delivery valve **763a** and fast delivery valve **763b**. The standard delivery valve **763a** is used if fuel is being pumped from the stationary fuel tank to the fuel tank of a vehicle. Alternatively, the fast delivery valve **763b** and associated nozzle **773** are used if fuel is being delivered to a pump truck.

Communication of data and information between the stationary fuel tank module **19** and a vehicle is accomplished through an antenna mounted on the fuel nozzle and one on the filler neck of the vehicle. Again, the fuel delivery operation is interrupted if continuity of communication between the respective coils is interrupted for more than one second.

The stationary fuel tank identification module **19** is useful in association with storage tanks that are either above or below ground or which store pressurized fluids, such as propane, oxygen, or ammonia. Alternatively, the nonmobile equipment module **15** or obvious variations thereof may be employed at stationary tank locations to provide, for example, customer identification, authorization codes and credit account information attendant to a fuel or other fluid delivery transaction.

A 2K memory key **722** may be used for an operator key and override of the fuel security system. The 64K memory key **759** may also be used for authorized downloading of fueling data information that has been stored by the stationary fuel tank identification module **19** over an extended period of time.

As with the other fuel delivery modules, the system may be overridden with an authorized memory key. A key pad can be added to input data for vehicles not equipped with an appropriate vehicle identification module. The stationary fuel tank module **19** may either be connected to a remote computer or data storage unit for on-line communication of fuel delivery transactions, or such information may be stored at the stationary tank identification module **19** and downloaded to the 64K memory key **759** which may then be transported to the remote processing location.

Fuel delivery transaction information and data recorded on the memory keys **559**, **659**, and **759** is downloaded for further processing by a memory key reader module **21** as illustrated in FIG. 10, with 800 series numbers identifying elements corresponding to elements of other modules described previously. The 64k bit memory key **559**, **659**, or **759** is coded to be identified by the memory key reader module **21** as an authorized transaction information key. It inputs information and data stored on it regarding fuel delivery transactions made from a fuel pump, a pump truck, or a stationary tank. The information and data is stored by the memory key reader module **21** for subsequent transfer via an RS485 link **895** to another computer. A liquid crystal display **893** and driver **891** are provided to display time

16

and date and prompts from the program controlling the memory key reader module **21**.

A passive identification module, indicated generally at **900** in FIG. 11, stores identification information for subsequent, repeated transmission to a fluid delivery device for the purpose of authorizing a fluid delivery transaction and for record keeping purposes regarding the transaction. The passive identification module has no independent battery or other power source. Operational energy is received from an active communication module, indicated generally at **1000** in FIG. 12, and associated with any of the gas pump module **24** (FIG. 7), the pump truck module **17** (FIG. 8), or the stationary tank module **19** (FIG. 9).

Identification information, such as the identity of a fluid container, fluid type for the container, and equipment type is stored in a programmable, read-only memory device **902**. In the preferred embodiment, 40 bits of information are stored on the PROM **902**. Alternatively, the passive identification module **200** may serve as an identification device for a person rather than a fluid container. In such an instance, the information stored on the PROM **902** would be information identifying the person. In either event, the information is used for security and record keeping purposes.

Operational energy for the passive identification module **900** is transmitted from the active communication module **1000**. A coil driver **1002** is connected to the CPU **532**, **632** or **732** in a similar manner as the coil drivers **574**, **74** or **774**. When the coil driver **1002** is enabled, a 153.6 kHz signal from the clock oscillator **1004** drives an LC circuit including a power transmit coil **1006** and a capacitor **1008** selected to tune the LC circuit to 153.6 kHz. The power transmit coil **1006** generates an RF signal at 153.6 kHz.

The passive identification module **900** includes a power receive coil **904** across which is connected a capacitor **906** selected to tune the coil to receive the 153.6 kHz power signal. The signal is passed through a rectifier **908** which puts out a supply voltage for powering the other components of the passive identification module **900**. The 153.6 kHz signal received by the power receive coil **904** is also sent to a counter **910** which controls the PROM **902** and sends a 4800 Hz signal to a phase shift key encoder **912** and a 76.8 kHz signal (one-half of 153.6 kHz) to a PSK modulator **914**. The PSK encoder **912** and modulator **914** transmit the information stored on the PROM **902** through an LC circuit tuned to 76.8 kHz including a signal transmitting coil **916** and an appropriate capacitor **918**. In the preferred embodiment, the 40 bits of information is transmitted in approximately 100 milliseconds.

The clock oscillator **1004** of the active communication module **1000** (FIG. 12) sends a 76.8 kHz signal to a synchronous demodulator **1010** which is connected to an LC circuit tuned at 76.8 kHz, including a capacitor **1014** and a signal receiving coil **1012**. The coil **1012** may be any of the coils **26**, **76** or **80** of the vehicle identification module **10** (FIG. 2), coils **126**, **176** or **180** of the trailer identification module **18** (FIG. 3), coil **226** of the automotive module **11** (FIG. 4), coil **326** of the mobile equipment module **13** (FIG. 5), or coil **426** of the nonmobile equipment module **15** (FIG. 6).

The signal from the demodulator **1010** passes through a low pass filter **1016** and through a phase shift key decoder **1018** to a shift register **1020** which is connected to the data bus of any of the CPUs **32**, **132**, **232**, **332** or **432**, depending on the application.

5,204,819

**17**

In a working embodiment used to identify a person, the power transmit coil 1006 and the power receiving coil 904 are approximately rectangular, having dimensions of three-fourths inch by two and one-half inches, consisting of eleven turns of thirty gauge copper wire. If a one-half amp signal is put through the power transmit coil 1006, an effective distance between the coils has been found to be approximately one-half inch, which results in a five milliamp signal at the rectifier 908 which is sufficient to power the passive identification module 900 to transmit its 40 bits of stored information.

If used to identify a fuel container, the size of the passive identification module 900 can be substantially increased to increase correspondingly the communication distance between the power receive coil 904 and the signal transmitting coil 916 and the corresponding coils of the active communication module 1000. Sufficient power can be transmitted over about six inches if the power transmit and receive coils are approximately five inches in diameter. The personal identification embodiment can be used to authorize a fuel delivery transaction to a fuel container that is not equipped with an identification module. Alternatively, the person identification embodiment can be used either in conjunction with a passive identification module 900 associated with the fuel container or any of the modules 10, 18, 20, 11, 13 or 15 discussed above.

The passive identification module thus functions like an identification card but which can be "petted" and read at a distance, permits the components of the active communication module 1000 to be completely sealed from the environment, is tamper proof, and can identify either a fuel container or an authorized person attempting to initiate a fuel delivery transaction.

The preferred embodiment described herein is a liquid petroleum fuel delivery system. The invention can, of course, be used with a delivery system for any fluid, such as water, oxygen, ammonia, solvents, herbicides and pesticides, and so on.

I claim:

1. Apparatus for authorizing the delivery of fluid to a fluid container from a fluid delivery device, comprising:
   a. a first information storage and retrieval device without an independent power source and associated with the fluid container;
   b. a second information storage and retrieval device associated with the fluid delivery device and capable of being operatively linked with said first information storage and retrieval device;
   c. an RF link between said first and said second information storage retrieval devices for the transmission of operational energy for said first information device from said second information device;
   d. means associated with said first information storage and retrieval device for transmitting information from said first information device to said second information device;
   e. security means associated with said second information storage and retrieval device for authorizing delivery of fluid to the fluid container only upon provision by said first information device of an identification signal approved by said second information device.

2. Apparatus as defined in claim 1, wherein said means for transmitting information comprises:
   i. a first antenna associated with the fluid container and in communication with said first information storage and retrieval device;

**18**

   ii. a second antenna associated with the fluid delivery device and in communication with said second information storage and retrieval device; and
   iii. wherein said fluid container identification information is exchanged via signals transmitted from said first antenna and received by said second antenna.

3. Apparatus as defined in claim 1, wherein said RF link comprises:
   i. a power receiving antenna associated with the fluid container; and
   ii. a power transmitting antenna associated with said second information storage and retrieval device and in communication with said power receiving antenna;
   iii. wherein said first information storage and retrieval means is powered by energy transmitted by said power transmitting antenna and received by said power receiving antenna.

4. Apparatus as defined in claim 1, wherein said security means permits delivery of fluid to the fluid container only when said first and said second information devices are in communication via said information transmitting means.

5. Apparatus as defined in claim 1, wherein said transmitting means comprises:
   i. a first inductive coil communication link associated with the fluid container; and
   ii. a second inductive coil communication link associated with the fluid delivery device.

6. Apparatus as defined in claim 5, further comprising:
   f. a fluid delivery orifice of the fluid container;
   g. a fluid delivery nozzle of the fluid delivery device;
   h. wherein said first inductive coil communication link is located adjacent said fluid delivery orifice;
   i. wherein said second inductive coil communication link is located adjacent said fluid delivery nozzle; and
   i. wherein said coils are in transmitting and receiving alignment and proximity when said fluid delivery nozzle is inserted into said fluid delivery orifice during said fluid delivery transaction.

7. Apparatus as defined in claim 1, wherein said RF link comprises:
   i. a power receiving coil link associated with the fluid container; and
   ii. a power transmitting coil link associated with the fluid delivery device.

8. Apparatus as defined in claim 7, further comprising:
   f. a fluid delivery orifice of the fluid container;
   g. a fluid delivery nozzle of the fluid delivery device;
   h. wherein said power receiving coil is located adjacent said fluid delivery orifice;
   i. wherein said power transmitting coil is located adjacent said fluid delivery nozzle; and
   j. wherein said coils are in transmitting and receiving alignment and proximity when said fluid delivery nozzle is inserted in said fluid delivery orifice.

9. Apparatus as defined in claim 1, further comprising means for communicating information regarding the fluid delivery transaction between the fluid delivery device and a remote location.

10. Apparatus as defined in claim 9, wherein said remote location is a credit/debit account for payment of fluid delivered in the transaction.

5,204,819

**19**

11. Apparatus for controlling and memorializing a fluid delivery transaction from a fluid delivery system to a fluid container, comprising:

  a. means associated with the fluid container for generating an identification signal;

  b. means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked with said identification signal means;

  c. an RF link between said identification signal means and said storage and retrieval means for the transmission of operational energy for said identification signal means from said storage and retrieval means;

  d. information communication means linking said identification signal means and said storage and retrieval means;

  e. security means association with said storage and retrieval means for verifying said identification signal prior to the delivery of fluid to the container; and

  f. wherein information regarding the fluid delivery transaction may be stored at said storage and retrieval means.

12. Apparatus as defined in claim 1, wherein said RF link comprises:

  i. a power receiving antenna associated with said identification signal means; and

  ii. a power transmitting antenna associated with said information storage and retrieval means and in communication with said power receiving antenna;

  iii. wherein said identification signal means is powered by energy transmitted by said power transmitting antenna and received by said power receiving antenna.

13. Apparatus as defined in claim 11, wherein said security means permits delivery of fluid to the fluid container only when said identification signal means and said storage and retrieval means are linked for communication via said information communication means.

14. Apparatus as defined in claim 11, further comprising means associated with said storage and retrieval means for communicating information regarding the fluid delivery transaction between the fluid delivery system information means and a remote location.

15. Apparatus as defined in claim 14 wherein said remote location is a credit/debit account for payment of fluid delivered in the transaction.

16. Apparatus as defined in claim 11 wherein said fluid container is a fuel tank of a vehicle.

17. Apparatus as defined in claim 16, wherein said information communication means comprises:

  i. a first antenna in communication with said identification signal means;

  ii. a second antenna in communication with said storage and retrieval means;

  iii. wherein said vehicle identification signal information is exchanged via signals transmitted from said first antenna and received by said second antenna.

18. Apparatus as defined in claim 11, wherein said information communication means comprises:

  i. a first inductive coil communication link associated with the fluid container device; and

  ii. a second inductive coil communication link associated with the fluid container device.

19. Apparatus as defined in claim 18, further comprising:

  a fluid delivery orifice of the fluid container;

  a fluid delivery nozzle of the fluid delivery device;

**20**

  h. wherein said first inductive coil communication link is located adjacent said fluid delivery orifice;

  i. wherein said second inductive coil communication link is located adjacent said fluid delivery nozzle; and

  j. wherein said coils are in transmitting and receiving alignment and proximity when said fluid delivery nozzle is inserted into said fluid delivery orifice during said fluid delivery transaction.

20. Apparatus for controlling and memorializing a vehicle fuel delivery transaction, comprising:

  a. means associated with the vehicle for generating an identification signal;

  b. means associated with the fuel delivery system for storing and retrieving information and capable of being operatively linked with said identification signal means;

  c. information communication means linking said vehicle identification means to said fuel delivery system information means;

  d. an RF link between said vehicle identification means and said fuel delivery system information means for the transmission of operational energy for said vehicle identification means from said fuel delivery system information means;

  e. security means associated with said storage and retrieval means for verifying said identification signal prior to the delivery of fuel to the vehicle; and

  f. wherein information regarding the fuel delivery transaction is stored at said fuel delivery system information means.

21. Apparatus for controlling and memorializing a fluid delivery transaction between a fluid container and a fluid delivery system, comprising:

  a. means associated with the fluid container for generating an identification signal;

  b. personal identification means for generating an identification signal identifying a person who is requesting the fluid delivery transaction and capable of being operatively linked with said identification signal means;

  c. means associated with the fuel delivery system for storing and retrieving information and capable of being operatively linked with said identification signal means;

  d. information communication means linking said fluid delivery system information means to both said fluid container identification means and said personal identification means;

  e. an RF link between said fluid delivery system information means and both said fluid container identification means and said personal identification means for the transmission of operational energy for both said fluid container identification means and said personal identification means;

  f. security means associated with said storage and retrieval device for verifying said identification signals prior to the delivery of fluid to the fluid container; and

22. Apparatus for controlling and memorializing a fluid delivery transaction requested by a person between a fluid container and a fluid delivery system, comprising:

  a. personal identification means for generating an identification signal identifying the person;

  b. means associated with the fluid delivery system for storing and retrieving information and capable of

5,204,819

21

being operatively linked to said personal identification means;

c. an RF link between said fluid delivery system information means and said personal identification means for the transmission of operational energy for said personal identification means;

22

d. information communication means linking said fluid delivery system information means and said personal identification means;

e. security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container; and

f. wherein information regarding the fluid delivery transaction is stored at said fluid delivery system information means.

* * * * *

US005204819C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (5608th)

# United States Patent
### Ryan

(10) **Number:** US 5,204,819 C1
(45) **Certificate Issued:** Nov. 21, 2006

(54) **FLUID DELIVERY CONTROL APPARATUS**

(75) Inventor: **Michael C. Ryan**, 118 Center Ave., N., Mitchellville, IA (US) 50169

(73) Assignee: **Michael C. Ryan**, Mitchellville, IA (US)

**Reexamination Request:**
No. 90/007,362, Dec. 22, 2004

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,204,819** |
| Issued: | **Apr. 20, 1993** |
| Appl. No.: | **07/573,631** |
| Filed: | **Aug. 27, 1990** |

(51) **Int. Cl.**
*G06F 15/20* (2006.01)
*G06F 7/04* (2006.01)
*H04B 5/02* (2006.01)

(52) **U.S. Cl.** .................... **705/413**; 340/5.9; 455/41.1; 902/5

(58) **Field of Classification Search** ................. 705/413; 340/5.9; 455/41.1; 902/5
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,196,418 A | 4/1980 | Kip et al. | |
| 4,263,945 A | 4/1981 | Van Ness et al. | |
| 4,345,146 A | 8/1982 | Story et al. | |
| 4,399,437 A | * 8/1983 | Falck et al. | ............. 340/10.51 |
| 4,469,149 A | 9/1984 | Walkey | |
| 4,846,233 A | 7/1989 | Fockens et al. | |

| | | |
|---|---|---|
| 4,934,419 A | 6/1990 | Lamont et al. |
| 5,058,044 A | 10/1991 | Stewart et al. |
| 5,070,328 A | 12/1991 | Fockens et al. |
| 5,072,380 A | 12/1991 | Randelman |
| 5,363,409 A | 11/1994 | Desilets |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0040544 | * | 5/1981 |
| FR | 2 600 318 | | 6/1988 |
| GB | 2017454 | * | 10/1979 |
| GB | 1577920 | * | 10/1980 |

OTHER PUBLICATIONS

Telsor Corporation; dated on or about Oct. 1987.
Diagonal Data Corporation; dated on or about Nov. 1987.

* cited by examiner

*Primary Examiner*—Michael O'Neill

(57) **ABSTRACT**

Apparatus for communication of information from a passive identification module that may be associated with a fluid container and an active communication module associated with a fluid delivery device. The passive identification module has no independent battery or power source but receives its operational energy from an RF signal generated by the active communication module. Upon initiation of a fluid delivery transaction a communication link is established between the passive identification and active communication modules and will proceed only if appropriate authorization is received by the active communication module and an associated information storage and retrieval device. Information regarding the fuel delivery transaction may be stored on the storage and retrieval device and may be communicated to another local or remote device for further processing.



US 5,204,819 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims 1, 9–11 and 20 are cancelled.

Claims 2–5, 7, 12–14, 16, 18, 19, 21 and 22 are deter-
mined to be patentable as amended.

Claims 6, 8, 15 and 17, dependent on an amended claim,
are determined to be patentable.

New claims 23–40 are added and determined to be
patentable.

**2**. Apparatus as defined in claim [1] *31*, wherein said
means for transmitting information comprises:

i. a first antenna associated with the fluid container and in
communication with said first information storage and
retrieval device;

ii. a second antenna associated with the fluid delivery
device and in communication with said second infor-
mation storage and retrieval device; and

iii. wherein said fluid container identification information
is exchanged via signals transmitted from said first
antenna and received by said second antenna.

**3**. Apparatus as defined in claim [1] *31*, wherein said RF
link comprises:

i. a power receiving antenna associated with the fluid
container; and

ii. a power transmitting antenna associated with said
second information storage and retrieval device and in
communication with said power receiving antenna;

iii. wherein said first information storage and retrieval
means is powered by energy transmitted by said power
transmitting antenna and received by said power
receiving antenna.

**4**. Apparatus as defined in claim [1] *31*, wherein said
security means permits delivery of fluid to the fluid con-
tainer only when said first and said second information
devices are in communication via said information trans-
mitting means.

**5**. Apparatus as defined in claim [1] *31*, wherein said
transmitting means comprises:

i. a first inductive coil communication link associated
with the fluid container; and

ii. a second inductive coil communication link associated
with the fluid delivery device.

**7**. Apparatus as defined in claim [1] *31*, wherein said RF
link comprises:

i. a power receiving coil link associated with the fluid
container; and

ii. a power transmitting coil link associated with the fluid
delivery device.

**2**

**12**. Apparatus as defined in claim [1] *21*, wherein RF link
comprises:

i. a power receiving antenna associated with said identi-
fication signal means; and

ii. a power transmitting antenna associated with said
information storage and retrieval means and in com-
munication with said power receiving antenna;

iii. wherein said identification signal means is powered by
energy transmitted by said power transmitting antenna
and received by said power receiving antenna.

**13**. Apparatus as defined in claim [1] *21*, wherein said
security means permits delivery of fluid to the fluid con-
tainer only when said identification signal means and said
storage and retrieval means are linked for communication
via said information communication means.

**14**. Apparatus as defined in claim [11] *21*, further com-
prising means associated with said storage and retrieval
means for communicating information regarding the fluid
delivery transaction between the fluid delivery system infor-
mation means and a remote location.

**16**. Apparatus as defined in claim [11] *21*, wherein said
fluid container is a fuel tank of a vehicle.

**18**. Apparatus as defined in claim [11] *21*, wherein said
information communication means comprises:

i. a first inductive coil communication link associated
with the fluid container device; and

ii. a second inductive coil communication link associated
with the fluid container device.

**19**. Apparatus as defined in claim **18**, further comprising:

f. a fluid delivery orifice of the fluid container;

g. a fluid delivery nozzle of the fluid delivery device;

h. wherein said first inductive coil communication link is
located adjacent said fluid delivery orifice;

i. wherein said second inductive coil communication link
is located adjacent said fluid delivery nozzle; and

j. wherein said coils are in transmitting and receiving
alignment and proximity when said fluid delivery
nozzle is inserted into said fluid delivery orifice during
said fluid delivery transaction.

**21**. Apparatus for controlling and memorializing a fluid
delivery transaction between a fluid container and a fluid
delivery system, comprising:

a. means associated with the fluid container for generating
an identification signal;

b. personal identification means for generating an identi-
fication signal identifying a person who is requesting
the fluid delivery transaction and capable of being
operatively linked with said identification signal
means;

c. means associated with the fuel delivery system for
storing and retrieving information and capable of being
operatively linked with said identification signal
means;

d. information communication means linking said fluid
delivery system information means to both said fluid
container identification means and said personal iden-
tification means;

e. an RF link between said fluid delivery system infor-
mation means and both said fluid container identifica-
tion means and said personal identification means for
the transmission of operational energy for both said
fluid container identification means and said personal
identification means; *and*

f. security means associated with said storage and
retrieval device for verifying said identification signals
prior to the delivery of fluid to the fluid container[;
and].

US 5,204,819 C1

3

**22.** Apparatus for controlling and memorializing a fluid delivery transaction requested by a person between a fluid container and a fluid delivery system, comprising:

a. personal identification means for generating an identification [signal.identifying] *signal identifying* the person;

b. means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means;

c. an RF link between said fluid delivery system information means and said personal identification means for the transmission of operational energy for said personal identification means;

d. information communication means linking said fluid delivery system information means and said personal identification means;

e. security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container; and

f. wherein information regarding the fluid delivery transaction is stored at said fluid delivery system information means.

*23. Apparatus as defined in claim 22, wherein said RF link comprises:*

*i. a power receiving antenna associated with said identification signal means; and*

*ii. a power transmitting antenna associated with said information storage and retrieval means and in communication with said power receiving antenna;*

*iii. wherein said identification signal means is powered by energy transmitted by said power transmitting antenna and received by said power receiving antenna.*

*24. Apparatus as defined in claim 22, wherein said security means permits delivery of fluid to the fluid container only when said identification signal means and said storage and retrieval means are linked for communication via said information communication means.*

*25. Apparatus as defined in claim 22, further comprising means associated with said storage and retrieval means for communicating information regarding the fluid delivery transaction between the fluid delivery system information means and a remote location.*

*26. Apparatus as defined in claim 25 wherein said remote location is a credit/debit account for payment of fluid delivered in the transaction.*

*27. Apparatus as defined in claim 22, wherein said fluid container is a fuel tank of a vehicle.*

*28. Apparatus as defined in claim 27, wherein said information communication means comprises:*

*i. a first antenna in communication with said identification signal means;*

*ii. a second antenna in communication with said storage and retrieval means;*

*iii. wherein said vehicle identification signal information is exchanged via signals transmitted from said first antenna and received by said second antenna.*

*29. Apparatus as defined in claim 22, wherein said information communication means comprises:*

*i. a first inductive coil communication link associated with the fluid container device; and*

*ii. a second inductive coil communication link associated with the fluid container device.*

*30. Apparatus as defined in claim 29, further comprising:*

*a fluid delivery orifice of the fluid container;*

*a fluid delivery nozzle of the fluid delivery device;*

*h. wherein said first inductive coil communication link is located adjacent said fluid delivery orifice;*

4

*i. wherein said second inductive coil communication link is located adjacent said fluid delivery nozzle; and*

*j. wherein said coils are in transmitting and receiving alignment and proximity when said fluid delivery nozzle is inserted into said fluid delivery orifice during said fluid delivery transaction.*

*31. Apparatus for authorizing the delivery of fluid to a fluid container from a fluid delivery device, comprising:*

*a. a first information storage and retrieval device without an independent power source and associated with the fluid container;*

*b. a second information storage and retrieval device associated with the fluid delivery device and capable of being operatively linked with said first information storage and retrieval device;*

*c. an RF link between said first and said second information storage retrieval devices for the transmission of operational energy for said first information device from said second information storage and retrieval device;*

*d. means associated with said first information storage and retrieval device for transmitting information from said first information device to said second information storage and retrieval device;*

*e. security means associated with said second information storage and retrieval device for authorizing delivery of fluid to the fluid container only upon provision by said first information device of an identification signal approved by said second information storage device; and*

*f. means for communicating information regarding the fluid delivery transaction between the fluid delivery device and a remote location wherein said remote location is a credit/debit account for payment of fluid delivered in the transaction.*

*32. Apparatus as defined in claim 31, wherein the first information storage and retrieval device comprises a memory key.*

*33. Apparatus as defined in claim 32, wherein the memory key comprises an ignition key of a vehicle, the fluid delivery device comprises a fuel pump of the vehicle, and the fluid container comprises fuel lines leading to an engine of the vehicle.*

*34. Apparatus as defined in claim 33, wherein the second information storage and retrieval device and the security means comprise ignition switch control circuitry of the vehicle.*

*35. Apparatus as defined in claim 21, wherein the identification signal means comprises a memory key.*

*36. Apparatus as defined in claim 35, wherein the memory key comprises an ignition key of a vehicle, the fluid delivery system comprises a fuel pump of the vehicle, and the fluid container comprises fuel lines leading to an engine of the vehicle.*

*37. Apparatus as defined in claim 36, wherein the means associated with the fuel delivery system for storing and retrieving information and the security means comprise ignition switch control circuitry of the vehicle.*

*38. Apparatus as defined in claim 22, wherein the personal identification comprises a memory key.*

*39. Apparatus as defined in claim 38, wherein the memory key comprises an ignition key of a vehicle, the fluid delivery device comprises a fuel pump of the vehicle, and the fluid container comprises fuel lines leading to an engine of the vehicle.*

*40. Apparatus as defined in claim 39, wherein the means associated with the fluid delivery system for storing and retrieving information and the security means comprise ignition switch control circuitry of the vehicle.*

\* \* \* \* \*

# United States Court of Appeals
## for the Federal Circuit

*RYDEX, LTD. v FORD MOTOR COMPANY,* 2013-1462, -1463

### CERTIFICATE OF SERVICE

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by STAMOULIS & WEINBLATT LLC, Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **September 30, 2013**, Counsel for Appellant has authorized me to electronically file the foregoing **Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Eric Allan Buresh
Jason R. Mudd
Erise IP
6201 College Blvd, Suite 300
Overland Park, KS 66211
913-777-5600
eric.buresh@eriseIP.com
jason.mudd@eriseip.com
*Counsel for Cross-Appellants*
*Ford Motor Company and*
*Mazda Motor of America, Inc.*

Eric W. Schweibenz
Oblon, Spivak, McClelland, Maier
& Neustadt, LLP
1940 Duke Street
Alexandria, VA 22314
703-413-3000
eschweibenz@oblon.com
*Counsel for Cross-Appellant*
*Toyota Motor Sales, U.S.A., In*c.

Jeffrey Scott Patterson
Hartline Dacus Barger Dreyer LLP
6688 North Central Expressway
Suite 1000
Dallas, TX 75206
214-346-3701
jpatters@hdbdk.com
*Counsel for Cross-Appellant Nissan*
*North America, Inc.*

Paper copies will also be mailed to the above counsel at the time paper copies

are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies

will be filed with the Court, via Federal Express, within the time provided in the

Court's rules.

September 30, 2013                          /s/ Elissa Matias_____
                                           Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

   X    The brief contains 5,449 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   X    The brief has been prepared in a proportionally spaced typeface using MS Word 2007 in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using _ _____in a ____ characters per inch_____ font.

September 30, 2013       /s/ Stamatios Stamoulis_____
                      Stamatios Stamoulis
                      Counsel for Appellant